**UNITED STATES of America,**
**Appellant,**

v.

**GEORGIA RAILROAD AND BANKING**
**COMPANY, Appellee.**

No. 20842.

United States Court of Appeals
Fifth Circuit.

June 30, 1965.

Louis F. Oberdorfer, Asst. Atty. Gen., John B. Jones, Jr., Acting Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Robert J. Golten, Attys., Dept. of Justice, Washington, D. C., Donald H. Fraser, U. S. Atty., of counsel, for appellant.

James R. Harper, Atlanta, Ga., Paul R. Russell, New York City, Joseph B. Cumming, Augusta, Ga., Shearman & Sterling, New York City, Cumming, Nixon & Eve, Augusta, Ga., Cuba, Harper & Cuba, Atlanta, Ga., William J. Cooney, Thurmond, Hester, Jolles & McElmurray, Augusta, Ga., of counsel, for appellee.

Philip M. Lanier, Louisville, Ky., Roderick M. Nicol, Jacksonville, Fla., for Atlantic Coast Line R. Co., and Louisville & N. R. Co., amici curiae.

Before WISDOM and GEWIN, Circuit Judges, and BREWSTER, District Judge.

GEWIN, Circuit Judge.

This appeal presents for our consideration two novel questions of federal income tax law. First, we must decide whether a lessor under a 99-year "lease" of corporate securities is entitled to the dividends-received deduction which § 243 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 243, affords to corporate shareholders.[1] Second, we must answer the question whether the taxpayer-lessor, having distributed the reversion in certain of the leased shares to its own stockholders as a dividend in kind, may amortize over the remainder of the lease term its retained interest in the distributed shares, including its right to receive income under the lease.[2] The district court allowed the taxpayer both the deductions it sought. We disagree and reverse on both issues.

The rather unusual transaction which gave rise to this suit had its genesis in the days prior to the Sixteenth Amendment and the advent of the now ubiquitous federal tax collector. On May 7, 1881, the Georgia Railroad & Banking Company entered into a "lease agreement" with William M. Wadley for a term of 99 years from April 1, 1881. The agreement covered all of the railroad properties owned by the taxpayer, including assets and securities of the Western Railway of Alabama and the Atlanta and West Point Railroad.[3] The lessee covenanted to make an annual payment of $600,000 for the use of the properties covered by the agreement, payable in two semi-annual installments. In addition, the lessee agreed to return the properties unimpaired in value and as well adapted to the business of transpor-

---

1. Section 243(a) provided in 1954:
   "In the case of a corporation, there shall be allowed as a deduction an amount equal to 85 percent of the amount received as dividends * * * from a domestic corporation which is subject to taxation under this chapter."

2. Section 167 allows a depreciation deduction for the exhaustion, wear, and tear "of property held for the production of income."

3. On May 7, 1881, the taxpayer owned 4,-409 shares of the capital stock of the Atlanta and West Point, representing about 36% of the outstanding capital stock of that company. In the original lease, the Georgia Railroad and Banking Company agreed to "assign and transfer

* * * the income of the stock" it then held in the Atlanta and West Point and to give the lessee an irrevocable power of attorney to vote those shares. This portion of the agreement was subsequently amended to the extent mentioned in note 6, infra, so that the stock itself was subjected to the lease terms. At the time the lease agreement was consummated, the Western Railway of Alabama was unincorporated and the taxpayer owned an undivided one-half interest. The Western of Alabama was later incorporated pursuant to the terms of the 1881 agreement, and taxpayer became owner of 15,000 of the 30,000 shares of capital stock which were issued. These were substituted under the lease agreement for the one-half interest in the unincorporated entity.

tation as they were in 1881.[4] The lessor had the right under the terms of the agreement to repossess the property upon breach of any of the covenants.[5]

Wadley's interest in the lease was eventually assigned to the Louisville & Nashville Railroad Company. The L & N in turn assigned one-half of its interest in the agreement to the Atlantic Coast Line Railroad, and the stock has been and is presently registered in the name of the L & N as trustee for itself and the Coast Line. After these assignments, the lease was amended by various supplemental agreements between 1899 and 1910.[6]

As of March 1, 1913, 9,361 shares of the Atlanta & West Point and 15,000 shares of the Western of Alabama were subject to the lease and the supplemental agreements. The number of leased shares and the proportionate ownership which those shares represent have

remained constant since that date. Pursuant to § 1053 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 1053, the property subject to the lease acquired a tax basis equal to its fair market value on March 1, 1913. Applying that standard, the district court found that the tax basis for a share of Atlanta and West Point was $150 and that of a share of Western of Alabama was $120.

On July 7, 1954, for business reasons relating to the regulatory policies of the Interstate Commerce Commission, the taxpayer in effect distributed its reversionary interest in 7,000 of the 9,361 shares of the Atlanta and West Point and 12,180 of the 15,000 shares of the Western of Alabama to its own shareholders as a dividend in kind. This distribution was accomplished by giving each stockholder Certificates of Participation which entitled him to receive a certain number of shares of each railroad or its

---

4. The agreement provided in part:

"The party of the second part [Wadley] also covenants for himself and his assigns to *return* the property hereinbefore rented, farmed out and assigned to the party of the second part in as good condition as it is now in, and unimpaired in value, that is to say, the Rail Roads and their appurtenances as well adapted to the business of transportation as they now are, and the personal property in personal property equal in value and as well adapted to its use as it now is."

5. "The party of the first part [Georgia Railroad & Banking Company] reserves the right, in addition to all other remedies now usual or hereafter to become usual in the law, to *enter upon and resume possession* and enjoyment of all its property for the breach of any of the covenants or agreements of this Indenture."

6. These supplemental agreements dealt primarily with property subsequently acquired by the Georgia Railroad & Banking Company which was placed under the 1881 lease agreement. On December 28, 1904, the Banking Company formally subjected the 15,000 shares of the Western Railway of Alabama to the 1881 lease, in consideration of $10, as follows:

"NOW, THEREFORE, in consideration of the premises and of the sum of Ten Dollars ($10.00) to the Banking Company by the Railroad Company well and truly paid at and before the execution of these presents, said Banking Company hereby transfers, assigns and sets over to the Railroad Company said Fifteen thousand shares of the capital stock of the Western Railway of Alabama to be held by said Louisville and Nashville Railroad Company in trust for itself and Atlantic Coast Line Railroad Company its co-lessee for and during the remainder of said Lease with the right in the Louisville and Nashville Railroad Company as Trustee as aforesaid *to the possession and custody thereof and to collect for itself and its co-lessee and use the dividends thereon,* and at the expiration of said term the estate in said stock hereby conveyed and all of the rights, powers and interest and possession of the said Railroad Company in said stock and its income are to terminate and the said Railroad Company is to return said stock to the Banking Company or its assigns." (Emphasis added)

A similar transaction occurred on May 10, 1905, with respect to the Atlanta and West Point stock, which had increased to 5,472 shares. By another agreement the number of shares of the Atlanta and West Point which were subject to the agreement was increased to 9,361.

equivalent after the expiration of the lease on April 1, 1980, or its earlier termination.[7] The taxpayer, however, retained all present interest in the shares whose reversion had been distributed, including all rights to receive the entire $600,000 annual payments pursuant to the terms of the 1881 lease agreement. No gain or loss was recognized to the taxpayer on this transaction, but the taxpayer did write off of its books that part of the basis which was attributable to the 1913 fair market value of the distributed reversionary interest.[8] The Internal Revenue Service ruled that the 1954 fair market value of the reversion was taxable to the recipient shareholders as dividend income in the year of receipt, and the taxpayer so advised the distributees of the certificates.[9] At that time the reversion in a share of Atlanta and West Point had a fair market value of $3.25 and a share of Western of Alabama had a fair market value of $6.24.

In 1954 and all prior years, the taxpayer had reported the full $600,000 annual payment as rental income. In 1954,

the taxpayer amended its return, claiming that a portion of the $600,000 payment represented constructive dividends against which it could offset the 85 per cent dividends-received deduction afforded by § 243. The dividends paid to the lessee on the leased stock during the fiscal period January 1, 1954, through October 6, 1954, totaled $84,361. Hence, the district court allowed the taxpayer a dividends-received deduction of $71,706.85.[10]

In addition, the taxpayer sought to depreciate under § 167 that portion of its 1913 basis in the stock whose reversion had been distributed which represented the 1913 fair market value of the right to receive income for the remaining 25¾ years of the lease on the theory that the rights the taxpayer retained upon distribution of the reversion constituted property held for the production of income which would be fully exhausted by April 1, 1980. The taxpayer and the district court imputed 63.57% of the 1913 basis of the stock to the interests retained by the taxpayer in the distributed shares, and the district court allowed a depreciation deduction of $15,501.21

7. Actually, the reversionary interests in the two blocks of shares which were to be distributed were assigned by Georgia Railroad and Banking Company to Colonial Trust Company and Empire Trust Company under Indentures of Trust dated July 7, 1954. Upon presentation of a Certificate of Participation on or after October 1, 1980 (or earlier if notified in writing by the trustee), the holder would be entitled to receive from the trustee a stock certificate representing a specified number of shares of the Atlanta and West Point or the Western of Alabama together with any dividends collected by the trustee thereon. A Certificate of Participation is therefore not a stock certificate and does not entitle the holder to the right to participate in any way in the management or earnings of the Atlanta and West Point or the Western of Alabama; it merely entitles him to become a stockholder in those railroads at a future date.

8. See Internal Revenue Code of 1954, § 312(a) (3), 26 U.S.C.A. § 312(a) (3).

9. See § 301(b) (1) (A), 26 U.S.C.A. § 301 (b) (1) (A). The Government, out of an abundance of caution, warns that the shareholders of the Georgia Railroad and Banking Company may have to pay another dividend tax upon actual receipt of the stock in the two railroads in 1980 or sooner. Such a tax would presumably be computed on any appreciation in the value of the shares at the time of receipt over the 1954 fair market value of the reversionary interest.

10. The district court found that the amount of the $600,000 allocable to the leased stock in any given year was $164,520. Of this amount $46,320 was allocable to the Atlanta and West Point shares and $118,200 represented payment for the use of the Western of Alabama shares. The amount of the $600,000 annual payment allocable to the leased shares for the fiscal period in question was $127,854. This figure exceeds the amount of dividends paid during that period by $43,493.

for the period from July 7, 1954, to October 6, 1954.[11]

The Government appeals from both holdings of the district court. We shall discuss each issue separately below.

## I

The taxpayer urges that it, rather than its lessees, is entitled to the dividends-received deduction since it is the beneficial owner of the shares of the two railroads.[12] The argument runs substantially as follows: The transaction in question is a long-term lease, an arrangement which is generally held not to vest beneficial ownership of the leased property in the lessee. Taxpayer also concurs in the district court's conclusion that the lessees are mere conduits for the payment of dividends, since the dividends actually received by the lessees are paid over to taxpayer *pro tanto* as a part of the $600,000 annual payment for the use of the property subject to the lease. In this connection, the taxpayer notes that the portion of the $600,000 payment which is properly allocable to the use of the stocks approximates that proportion of the average earnings (and thus the dividends) of the two railroads which related to the leased stock during the five-year period immediately preceding the consummation of the 1881 agreement.[13] Moreover, in the taxable year in question the amount paid for the use of the shares greatly exceeded the dividends paid out to the lessees. The lessor made the initial capital investment in the two railroads and, therefore, is the real shareholder in the two corporations.[14] The lessees, on the other hand, have contributed no capital to the two enterprises. This argument taxpayer urges, comports with the purpose of § 243 to minimize the double taxation which would otherwise occur when one corporation invests in another. In substance, the transaction amounts to an anticipatory assignment of income for 99 years without the con-

11. The March 1, 1913, value of the right to receive income from July 7, 1954, to April 1, 1980, was $1,596,624. If the district court's decision on this issue is upheld, the taxpayer will be afforded an annual depreciation deduction of roughly $62,000.

12. We think it appropriate to note that the present lessees, Louisville & Nashville Railroad Company and Atlantic Coast Line Railroad Company, were permitted to appear as amici curiae for the purpose of filing briefs and presenting oral argument on the dividends-received issue. They are not parties to this suit, and nothing in this opinion is intended as an adjudication of the tax consequences of the transaction in question as to them. Indeed, we could not presume to decide such issues.

13. There is apparently some basis for an inference that the portion of the annual payment which the district court found was allocable to the use of the shares of the two railroads was geared to the average earnings of the two roads during the years 1877–1881. The following is from the taxpayer's brief:
"The average annual earnings of Atlanta & West Point for the five year period 1877 to 1881, inclusive, amounted to $115,438, and the average of Western for the same period amounted

to $210,851; on the basis of the taxpayer's percentage of ownership of Atlanta & West Point (35.78%) and its percentage of ownership of Western (50%), the average annual earnings attributable to the leased shares of the respective railroads was $41,304 in the case of Atlanta & West Point and $105,426 in the case of Western. The lessee's annual payments for the respective shares, $46,320 (Atlanta & West Point) and $118,200 (Western) were somewhat greater than the average earnings attributable to the shares during the five years 1877 to 1881 but less than the allocable earnings for 1880, the year immediately prior to the execution of the lease."

14. Section 243 merely grants the deduction against "the amount received as dividends," without defining the term "dividends." That term is defined in § 316 as "a [any] distribution of property made by a corporation to its *shareholders*— (1) out of earnings and profits." See Bittker, Federal Income Taxation of Corporations and Shareholders, P. 48 (1959). Therefore, in a sense the issue in the instant case is whether the taxpayer or the lessees are to be deemed the "shareholders" of the Atlanta and West Point and the Western of Alabama during the term of the lease.

comitant transfer of the underlying income-producing property. Under established principles, the assignor is properly taxable on such income and, of course, entitled to the benefit of any deductions which are directly related to the income so assigned.

■■ We think the taxpayer's argument is unpersuasive in several respects. The purpose of § 243 is to eliminate the multiple taxation of corporate earnings which would otherwise occur whenever one corporation holds shares of stock in another corporation. Thus, the deduction seems to be directed more to the preservation of income from the stock than to the protection of the investment in the underlying company. This Circuit and other courts have recognized that, where ownership of shares of corporate stock is fleeting or uncertain, the dividends-received deduction is available only to the beneficial owner of the shares. See, e. g., Rupe Investment Corp. v. Commissioner of Internal Revenue (5 Cir. 1959), 266 F.2d 624; Joseph L. O'Brien Corp. v. Commissioner of Internal Revenue (3 Cir.), 301 F.2d 813, cert. denied, 371 U.S. 820, 83 S.Ct. 37, 9 L.Ed.2d 61 (1962). And, of course, the question of beneficial ownership must be measured according to the substance of the transaction as a matter of federal income tax law rather than according to technical forms and concepts of state property law. Thus, the question is not whether the transaction should be characterized as an assignment for a term or a lease, but rather whether the taxpayer had so little control over the stock during the 99-year period that he cannot be said to have retained beneficial ownership of the shares.[15]

■ An examination of the factors which indicate the situs of beneficial ownership of the shares of stock which are subject to the lease agreement leads us to the conclusion that if beneficial ownership lies anywhere during the lease term it lies with the lessees, not the taxpayer. Virtually all the indicia of present ownership are vested in the lessees. We start with the proposition that the 1881 lease, together with the supplemental agreements, undoubtedly were conceived in a bona fide, arm's length business transaction in which the Georgia Railroad and Banking Company substituted a fixed annual income on its shareholdings for the normal risks of a business venture to which mere ownership of the shares would subject it. This business purpose is borne out by the fact that there is no attempt in either the 1881 agreement or its subsequent modifications to gear the rent allocable to use of the shares of the two railroads to the dividends actually paid to the lessee.[16] By the terms of the lease, the full $600,-000 remains due each year whether the two railroads pay no dividends at all in that year or pay dividends equalling twice the amount of the "rent." We think the duration of the lease is also economically significant. A 99-year lease has afforded the lessees a substantial opportunity to manage and develop the two railroad companies. The lessees have virtually unfettered authority to vote the shares as they see fit and to participate in the selection of the directors of both corporations. The lessee really bears the operating risks of the two enterprises; as a practical matter, all present rights in the leased stock have been transferred to the lessees for the terms of the agreement. They also have physical possession of the stock certificates. The fact that the leased shares are recorded in the name of the L & N as trustee for itself

---

15. Amicus-lessees have stressed the nature of the 1904 and 1905 assignments, which to a certain extent modified the original 1881 agreement, emphasizing that an assignee does obtain beneficial ownership of the leased property although a lessee may not. We do not deem the technical characterization of the transaction controlling, however.

16. As pointed out in note 13 supra, it can be argued that the payment for the use of the stock was geared to the earnings of the two railroads. However, the dividends need not necessarily correspond directly to the earnings.

and the Coast Line simply serves to bolster the conclusion that the parties have treated the lessees as beneficial owners of the shares, although this factor alone can, of course, never be controlling. It is not without significance that the lessor, prior to 1954, treated the full $600,000 payment on its tax returns as rental income rather than partially as dividends constructively received from the lessees. Perhaps most telling of all is the provision in the 1904 and 1905 assignments that the lessees could collect for themselves and use the dividends on the leased stock during the term of the agreement. This statement clearly suggests to us that both lessor and lessee contemplated full and free use by the lessees of whatever dividends were paid.[17] In addition, the taxpayer's claim to beneficial ownership is undermined to some degree by the fact that the reversionary interest in most of the leased stock has now been distributed to its own shareholders.

Of course, the taxpayer still holds whatever rights it has as lessor under the lease. This includes only the right to enforce the covenants of the lease and, upon default, to obtain an earlier distribution of the actual shares to the taxpayer's shareholders and repossess the shares not distributed. The restrictions on the lessees, on the other hand, are relatively minor. They cannot, for example, encumber the property subject to the lease or vote the shares for that purpose, and they must return the leased property in as good condition as when it was leased and "unimpaired in value."[18] Therefore, we conclude that, in the circumstances of this case, the lessor-taxpayer has, in substance, divested himself of beneficial ownership of the shares and is not entitled to deduct 85% of the dividends paid on those shares against the $600,000 annual payment made by the lessees for the use of the shares.

The taxpayer contends that the logic of this court's decision in Rupe Investment Corp. v. Commissioner, supra, requires a conclusion that it is the beneficial owner of the shares. In that case we held that an investment company which had temporary record title of stock which it was purchasing as agent for another was not entitled to the dividends-received deduction on dividends actually paid to it during the period of its record ownership. In reaching that conclusion we approached the problem in much the

---

17. For the exact language, see note 6 supra. We are reinforced here by two additional facts. Upon distribution of the reversion in most of the shares in July 1954, the taxpayer's President stated in his letter to the stockholders:

"The reversionary interest is in shares constituting a portion of the 15,000 shares of Western and the 9,361 shares of Atlanta which, together with the railroad property of the Company, are held by Atlantic Coast Line Railroad Company and Louisville & Nashville Railroad Company as Lessees under a Lease expiring in April, 1980. The Lessees are entitled, until the expiration of the Lease, to vote such shares and *to receive all dividends which are paid thereon.* You will notice that the Company is retaining its interest in 2,820 shares of Capital Stock of Western and in 2,361 shares of Capital Stock of Atlanta." (Emphasis supplied).

Also, the taxpayer's expert witness refused to state that the dividends were included in the $600,000 annual payment. The record contains the following colloquy:

"Q. Mr. Love, will you state whether or not, in your opinion, as an expert in accounting procedure, based on your examination of the records of the Georgia Railroad and Banking Company and the exhibits that you have offered herein this case, whether or not the dividends that were payable on the stocks leased by the Georgia Railroad and Banking Company in the Western Railroad of Alabama and the Atlanta and West Point Railroad were included in this $600,000.00 annual rental paid back to the Lessor?

"A. In my opinion the $600,000.00 annual rental was compensation for the use of these railroad properties and the railroad securities, earnings of both the railroad securities and the railroad properties."

18. It is perhaps debatable whether these conditions of the agreement were intended to apply to the shares of stock themselves. Also, the lease provides that the lessor must pay for all "necessary and proper *betterments*" which the lessee made on the property subject to the agreement.

same fashion that we have here, analyzing the substance of the transaction for the purpose of pinpointing the location of beneficial ownership. Factually, the case is clearly distinguishable from the instant one, but the court adhered, as we do, to the basic principle that "taxation is not so concerned with nice refinements of title as it is with actual command over property." 266 F.2d at 630; see Harrison v. Schaffner, 312 U.S. 579, 581, 61 S.Ct. 759, 85 L.Ed. 1055, 1057 (1941). Taxpayers here, like the taxpayers in Rupe, did not have such command.

As noted above, the taxpayer relies heavily on the anticipatory-assignment-of-income cases, notably Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930); Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75, 131 A.L.R. 655 (1940); and Harrison v. Schaffner, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055 (1941). We do not think the principle of those cases is applicable here. Their rationale is that income from personal services or income-producing property cannot be "attributed to a different tree from that on which [it] grew," Lucas v. Earl, supra, 281 U.S. at 115, 50 S.Ct. at 241, 74 L.Ed. at 733, in advance of its realization in order to escape a tax on that income. The assignments in all of those cases were gratuitous and the underlying asset which produced the income remained with the taxpayer-donor. And in United States v. Joliet & Chicago R.R., 315 U.S. 44, 62 S.Ct. 442, 86 L.Ed. 658 (1942), there was a constructive receipt by the taxpayer of income payments made directly to its shareholders in discharge of its obligation to them. Any other result would have permitted the corporation to separate the income itself from the income-producing entity, thereby avoiding the double tax imposed on corporate earnings. In the instant case, as we have noted above, the taxpayer has not gratuitously assigned the dividends from the shares of the two railroads; rather, it has substituted a fixed income for 99 years in lieu of the dividend income in an arm's-length bargain. There is therefore no question of attempting to shift the incidence of ordinary income taxation.[19]    Additionally, as we have

19. Compare Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958.) In that case the owner of a ⅞ working interest in a mineral lease transferred to a third party a $600,000 oil payment right in exchange for the cancellation of an indebtedness, in effect bargaining for the immediate realization of income as a substitute for an income interest which it was estimated would pay out in about three years. The Supreme Court held that the taxpayer was subject to tax at ordinary income rates rather than capital gains rates. While the court relied in part on the anticipatory assignment rationale, the situation here is simply not analogous. It is not contended in the instant case that capital gains rates are applicable to the rent received by the taxpayer or that the taxpayer is attempting to convert some of his ordinary income into capital gains. Only the bargain struck in both cases is similar.

Taxpayer emphasizes that the taxpayer in Lake was entitled to charge the depletion allowance against the substituted income and argues by analogy that in the instant case the taxpayer should be entitled to the § 243 deduction against his substituted fixed income. We think this argument fails to accommodate the distinction in the nature of the two deductions. The depletion deduction relates to the exhaustion of the mineral content of the land and is directed more to the capital investment in the underlying mineral lease. See Paragon Jewel Coal Co. v. Commissioner of Internal Revenue, 380 U.S. 624, 85 S.Ct. 1207, 14 L.Ed.2d 116,-122 (1965); United States v. Shurbet (5 Cir. June 7, 1965), 347 F.2d 103. In Lake, the taxpayer had retained the entire working interest in the lease, divorcing from it only a small portion of the total income from development of that capital asset. On the other hand, the taxpayer in the instant case has bargained away more than his present income rights in the two blocks of stock. Furthermore, the dividends-received deduction is related directly to the amount of income received each year as dividends. It would be anomalous indeed to permit the taxpayer a deduction of 85% of the dividends paid out each year on the stock when the deduction could conceivably exceed the amount of rent allocable to the shares for the corresponding year.

pointed out above, more than the right to receive the income from the stock was transferred to the lessees during the lease term. Virtually all the incidents of present ownership passed to the L & N and the Coast Line for the 99-year period. In this respect, the instant case is comparable to Blair v. Commissioner of Internal Revenue, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed 465 (1939), where the life beneficiary of a testamentary trust gratuitously assigned a certain portion of the trust income to his daughter for the remainder of his life. It was held that the incidence of taxation shifted to the daughter because she became *beneficial owner* of that portion of the life interest.

The taxpayer also warns of possible tax-avoidance implications if the lessee is entitled to a dividends-received deduction. The district court also pointed out that a holding which would enable the lessee of corporate stock to take the dividends-received deduction would encourage trafficking in the deduction. For example, an owner of corporate stock could lease the shares to his wholly owned subsidiary for a stipulated rental. Under such a holding, it is argued, the corporation would be taxed on only 15% of the dividends and could obtain a full deduction for the "rent" paid over to the real owner of the shares. We are confident that the Commissioner and the courts will guard against any tax-avoidance scheme which has no business purpose other than to take advantage of the double deduction referred to above just

as consistently as they have in the past.[20] Cases of this nature must, to a degree, be taken on their particular facts. Suffice it to say that the spectre of tax avoidance is totally absent from the instant case. We have before us a bona fide bargain consummated almost 32 years before the income tax law became effective, and both lessor and lessee have derived material business benefits from the transaction.[21]

In summary, we think the taxpayer divested himself of beneficial ownership of the shares in question and thus may not take advantage of the benefits of § 243. What the taxpayer in substance is receiving under the 1881 agreement is rental income, taxable as such.

## II

The taxpayer contends that, having distributed the reversion in certain of the leased shares to its own stockholders as a dividend in kind, it may now take annual depreciation deductions to recover the capital investment in what remains.[22] It is argued that taxpayer has retained all present rights in the distributed shares, the most significant aspect of which is the right to receive the $600,000 annual payment for the remainder of the lease term. The present interest in those shares constitutes property held for the production of income, and its productive capacity is diminishing each year. By 1980, the productivity of the retained property will be totally exhausted. Section 312(a)

20. Sham transactions and those with no business purpose have been viewed by the courts with a jaundiced tax eye. See, e.g., Van Zandt v. Commissioner of Internal Revenue (5 Cir. 1965), 341 F.2d 440, petition for cert. filed, 33 U.S. L. Week 3365, May 5, 1965; Ackerman v. United States (5 Cir. 1964), 335 F.2d 521. For example, the entire field of anticipatory assignments of income has as its rationale the piercing of schemes which pervert economic realities in order to glean a tax advantage. In connection with corporate deductions, the statute itself offers support for this approach. See 26 U.S.C.A. § 269, which could conceivably apply to certain in-

stances of trafficking in the dividends-received deduction. In fact, courts have pierced several such transactions apart from § 269. E.g. Liston Zander Credit Co. v. United States (5 Cir. 1960), 276 F.2d 417; Empire Press, Inc., 35 T.C. 136 (1960); Armais Arutunoff, P-H Memo, ¶ 63, 192, July 19, 1963.

21. We underscore again the caveat we expressed earlier, see note 12, supra, that we cannot determine the tax consequences of the instant transaction to the L & N and the Coast Line.

22. Of course, taxpayer does not seek depreciation as to those shares whose reversion was not distributed.

(3) requires the taxpayer to charge off that portion of its adjusted basis which represents the reversionary interest distributed to its shareholders as a dividend, and the $1,596,624 remaining on its books constitutes the 1913 value of the present ownership rights in the leased shares from 1954 to 1980. This figure may be amortized over the remaining years of the lease, taxpayer reasons, since it forms the "cost basis" of the retained interest in the stocks.

We accept the taxpayer's and the district court's interpretation of § 312 for the purpose of this decision, and we do not question the accuracy of the taxpayer's computation of the adjusted basis of the retained interest. Nevertheless, we cannot agree that § 167 permits a deduction in circumstances such as these. Although the taxpayer's argument may have a certain theoretical appeal, it does not make tax sense.

The Government argues that whatever interests were retained by the taxpayer in the distributed stock are insufficient to constitute "property" as that term is used in § 167. Nothwithstanding the fact that the taxpayer's retained interest, even if it be a mere contract right, would constitute valuable property in the ordi-

nary sense of the term, see e. g., Commissioner of Internal Revenue v. P. G. Lake, Inc., supra, note 19; Commissioner of Internal Revenue v. Gillette Motor Transport, Inc., 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960), it does not automatically follow that such an interest is depreciable. The lessor's rights in a leasehold are derived from the income-producing capacity of the underlying property interest. Ordinarily, it is that underlying property which constitutes the depreciable asset. In the instant case, the income-producing property is corporate stock, which has long been held a non-depreciable asset by its very nature. See Exposition Souvenir Corp. v. Commissioner of Internal Revenue (2 Cir. 1947), 163 F.2d 283, 285; 4 Mertens, Law of Federal Taxation, § 23.49. Thus, taxpayer was not entitled to amortize its cost or other basis of the shares themselves. Furthermore, we cannot agree that a leasehold which was created after the acquisition of the underlying property by the taxpayer can itself constitute a depreciable asset except to the extent that the taxpayer incurred additional capital costs in obtaining the leasehold.[23] It follows that the taxpayer, in 1913, possessed no depreciable property interest in the leased shares.

---

**23.** Apparently the depreciability of a leasehold created from taxpayer-owned property has never been decided directly, although it seems implicit in the nature of the deduction that it cannot be taken directly against the diminishing rental income. The right to lease property is merely a valuable incident of the property itself; in the instant case, upon the termination of the lease there will be no exhaustion of the underlying property. Mertens seems to recognize this:

"To be subject to depreciation, a leasehold must have been acquired by the taxpayer, either as lessor or as lessee (1) for use in his trade or business or held by him for production of income and (2) at a cost to himself. The payment must have been for the acquisition of the leasehold by the taxpayer."

4 Mertens, Federal Income Taxation, § 23.84, at 170–71. However, the purchase of a leasehold apart from the underlying property has been held depreciable to the extent of its cost basis. E.g., 1220

Realty Co. v. Commissioner of Internal Revenue (6 Cir. 1963), 322 F.2d 495; Dab v. Commissioner of Internal Revenue (2 Cir. 1958), 255 F.2d 788; Home Trust Co. v. Commissioner of Internal Revenue (8 Cir. 1933), 65 F.2d 532; see Bell v. Harrison (7 Cir. 1954), 212 F.2d 253, 255. Also, depreciation deductions have been accorded a leasehold acquired simultaneously with the underlying property where there is proof that a portion of the cost was attributable to the "premium value" of a favorable lease. Commissioner of Internal Revenue v. Moore (9 Cir. 1953), 207 F.2d 265, cert. denied, 347 U.S. 942, 74 S.Ct. 637, 98 L.Ed. 1091 (1954). Contra, Schubert v. Commissioner of Internal Revenue (4 Cir. 1961), 286 F.2d 573, cert. denied, 366 U.S. 960, 81 S.Ct. 1919, 6 L.Ed.2d 1253; Friend v. Commissioner of Internal Revenue (7 Cir. 1941), 119 F.2d 959, cert. denied, 314 U.S. 673, 62 S.Ct. 136, 86 L.Ed. 538. There is no such contention here.

In 1913 the shares were assigned a basis equal to their fair market value on March 1 of that year. There is conflicting testimony in the record as to the effect which the outstanding lease might have had on the value of the stocks, but the district court's determination of fair market value apparently did not take the lease into account in fixing those values. There was certainly no clear proof that the lease had reserve rentals which would justify allocation of a portion of the 1913 basis to the value of the leasehold. Indeed, the taxpayer is not contending that any portion of the basis is allocable to the premium value of the leasehold itself.

It is argued, however, that the 1954 distribution of the reversion was an occurrence with peculiar economic and tax significance. We cannot agree. By distributing the reversion in 1954, taxpayer did nothing more than split its bundle of property rights into two parts. We cannot see how this action on its part can result in a depreciable asset where none previously existed, unless it made some additional investment. The rights which the taxpayer retained after the distribution are merely a fragment of the total bundle of nondepreciable property rights which the taxpayer had before the distribution. The taxpayer has obtained no asset which it did not have in 1913. While similar property might constitute a depreciable asset when acquired separately from the reversionary interest in the shares themselves and while a portion of the total tax basis of the shares can reasonably be allocated to the retained interest,[24] the mere fact that a basis exists on the taxpayer's books and that the property is exhaustible does not alone confer depreciability. While there need not always be a *cost* to the taxpayer in order to permit a depreciation deduction, we think in the present circumstances the taxpayer is required to show the acquisition of property in which he has some separate investment before he can claim a depreciation deduction.[25] See Detroit Edison Co. v. Commissioner of Internal Revenue, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286 (1943). Depreciabil-

**24.** In Schubert v. Commissioner of Internal Revenue supra 286 F.2d at 579, the court stated:
"[T]he statutory provisions prescribing the 'basis' for computing depreciation do not also create depreciability. 'Depreciation allowances are limited to depreciable property and exclude assets not of that character.' Friend v. Commissioner of Internal Revenue, 7 Cir., 1941, 119 F.2d 959, 960."

**25.** It has been recognized that in certain circumstances a taxpayer may acquire depreciable property at no actual cost to himself. For example, a donee generally acquires property at the adjusted basis of his donor at the time of the gift. 26 U.S.C.A. § 1015. In such a situation, the donee might be treated as having a depreciable investment in such property if it is of an exhaustible nature. See 26 U.S.C.A. § 167(f). Similarly, for estate tax purposes property acquired from a decedent is assigned a basis equivalent to the fair market value of the property either at the decedent's death or at the alternate valuation date. 26 U.S.C.A. § 1014. By § 167(f), this basis figure is also considered the basis of property acquired by inheritance for depreciation purposes.

"[T]he effect of [§ 1014] and [§ 167(f)], is to put the heir in the same position as if he were a purchaser. As stated in Reisinger v. Commissioner of Internal Revenue, 2 Cir., 144 F.2d 475, 477: 'The purpose of the statute allowing deductions for depreciation is to permit the taxpayer currently to receive income tax-free to the extent that wear and tear and time decrease the value of his investment, *or what is treated as his investment,* in the property.' (Emphasis ours.) It is the effect of Secs. 113(a) (5), 114(a) and 23(n), to treat the values passing to the taxpayer as an heir 'as (her) investment'."
Commissioner of Internal Revenue v. Moore (9 Cir. 1953) supra; see Pearson v. Commissioner of Internal Revenue (5 Cir. 1951), 188 F.2d 72, cert. denied, 342 U.S. 861, 72 S.Ct. 88, 96 L.Ed. 648. *But see* Schubert v. Commissioner of Internal Revenue, supra. Aside from these situations, a taxpayer's basis for depreciation will approximate cost. We think an additional capital investment by the taxpayer is a necessary attribute of depreciable property which is created from a nondepreciable property interest already owned and controlled by him.

ity cannot be conferred merely by the voluntary, gratuitous division of its non-depreciable property into two segments, one of which becomes, as a result of the separation, wasting solely by reason of lapse of time.[26] No tax consequences would have ensued if the taxpayer's entire interest in the shares had been distributed in 1954;[27] we cannot see why any different result should obtain because taxpayer divests itself of only a portion of those rights in that same year. To hold otherwise would, we think, be to distort the economic realities of the 1954 distribution.

■■■ Nor is it significant that, as a matter of accounting, the taxpayer may have been required by § 312 to reduce its earnings and profits by the adjusted basis of the property distributed. The taxpayer contends that, having lost a large portion of its basis without any concomitant transfer of basis to its shareholders, it should be permitted to recover the remainder of the basis still on its books. However, the transaction, from the taxpayer's viewpoint, had the same economic significance as if it had waited until the expiration of the outstanding lease to distribute the shares. In that event, taxpayer would have recovered no portion of its basis through a deduction. In short, we think § 312 has no relationship to the tax consequences of the transaction to the taxpayer. The loss of basis in the hands of the taxpayer's shareholders has resulted from the form in which the transaction was cast.[28] That form cannot affect the tax consequences of the transaction to the taxpayer.

We conclude that the district court erred in allowing the taxpayer a deduction equivalent to 85% of the dividends paid on the leased shares and in permitting the taxpayer to amortize the interest it retained in the leased shares whose reversion was distributed. Accordingly, the judgment is reversed with directions to enter judgment for the United States.

---

**26.** An analogous statutory purpose is exemplified by § 273, 26 U.S.C.A. § 273, which provides that a life income interest acquired by gift "shall not be [reduced or] diminished by any deduction for shrinkage (by whatever name called) in the value of such interest due to [the] lapse of time." See also Codman v. Miles (4 Cir. 1928), 28 F.2d 823, cert. denied, 278 U.S. 654, 49 S.Ct. 179, 73 L.Ed. 564 (1929).

**27.** Section 311(a) (2) provides that no gain or loss shall be recognized to a cor-

poration upon the distribution of property with respect to its stock.

**28.** It may be that if, as the Government intimates, the holders of the Certificates of Participation are required to pay an additional dividend tax upon actual receipt of the distributed shares, a large portion of this allegedly lost basis will be recouped. However, from the point of view of some of the taxpayer's shareholders, it would appear more advantageous for the basis to remain lost.