T.C. Memo. 1999-45


UNITED STATES TAX COURT


CGF INDUSTRIES, INC. AND SUBSIDIARIES, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 25343-93, 1090-94,    Filed February 12, 1999.
            2452-94, 15978-94.


Gale T. Miller, Laurence E. Nemirow, Robert S. Rich, and
John R. Wilson, for petitioners in docket Nos. 25343-93, 1090-94,
and 2452-94.

Patrick A. Jackman, Laurence E. Nemirow, Robert S. Rich, and
John R. Wilson, for petitioner in docket No. 15978-94.

Stephen M. Miller and Richard D. D'Estrada, for respondent.


MEMORANDUM OPINION


FAY, Judge:  CGF Industries, Inc. (CGF), computes its income

on the basis of a fiscal year ending on March 31.  For its 1988

---

[1]Cases of the following petitioners are consolidated
herewith:  Lincoln Industries, Inc. and Subsidiaries, docket
No. 1090-94; CGF Industries, Inc. and Subsidiaries, docket No.
2452-94; and Lincoln Industries, Inc. and Subsidiaries, docket
No. 15978-94.

through 1992 taxable years, CGF was the common parent of an affiliated group of corporations making a consolidated return of income. By notices of deficiency respondent determined deficiencies in Federal income taxes of the CGF affiliated group in the following amounts:

| Fiscal Year Ending | Deficiency |
|---|---|
| 1988 | $4,369,352 |
| 1989 | 745,105 |
| 1990 | 362,525 |
| 1991 | 259,708 |
| 1992 | 214,805 |

Likewise, Lincoln Industries, Inc. (Lincoln), uses a fiscal year ending on March 31 to compute its income. For taxable years 1989 through 1993, Lincoln was the common parent of an affiliated group of corporations making a consolidated return of income. By notices of deficiency respondent determined deficiencies in Federal income taxes of the Lincoln affiliated group in the following amounts:

| Fiscal Year Ending | Deficiency |
|---|---|
| 1989 | $294,285 |
| 1990 | 562,953 |
| 1991 | 562,653 |
| 1992 | 562,306 |
| 1993 | 578,561 |

By order of this Court dated January 19, 1995, these cases were consolidated for purposes of trial, briefing, and opinion. In a stipulation of partial settlement filed with the Court on January 18, 1995, respondent conceded all deficiencies determined against CGF and its subsidiaries for 1988, thus removing all issues relating to the 1988 tax year from consideration in these

cases. This leaves in controversy the sole remaining issue for our decision: whether CGF and Lincoln are entitled to amortize the costs of acquiring term interests in partnerships where related persons simultaneously acquired the remainder interests in those partnerships.

The facts of these cases are fully stipulated. The stipulation of facts, first supplemental stipulation of facts, stipulation of settled issues, and attached exhibits are incorporated herein by this reference. All section references are to the Internal Revenue Code in effect for the taxable years in issue, all Rule references are to the Tax Court Rules of Practice and Procedure, and dollar amounts have been rounded to the nearest dollar, unless otherwise indicated. The facts necessary for an understanding of these cases are as follows.

Background of CGF

CGF, a Kansas corporation since 1972, maintains its principal offices in Topeka, Kansas. It is a family-owned corporation; most of its stock is held by trusts for the benefit of members of that family. It has been engaged, directly and through its subsidiaries, in various businesses, including agriculture, petroleum, real estate, manufacturing, and cable television. As of August 1, 1988, the following entities owned the class A common voting stock of CGF:

| Shareholder | Ownership Percentage |
|---|---|
| Diana C. Broze Revocable Trust | 18.258% |
| H. Bernerd Fink Revocable Trust | 2.305 |
| Marcia F. Anderson Revocable Trust | 2.784 |
| Ruth G. Fink Revocable Trust | 38.893 |
| Curmudgeon Revocable Trust, Bruce G. Cochener, sole beneficiary | 17.749 |
| Bruce G. Cochener Trust Number One | 0.925 |
| Caroline A. Cochener Revocable Trust | 17.255 |
| Bruce M. Bolene Revocable Trust | 0.490 |
| Joaquin Mason Trust Number One | 0.416 |
| BENECO, Inc., Bruce M. Bolene Revocable Trust, sole shareholder | 0.925 |
| Total | 100.000 |

During July 1988, the directors of CGF were the following individuals:

> H. Bernerd Fink, chairman
> Ruth G. Fink
> Marcia F. Anderson
> Diana C. Broze
> Caroline A. Cochener
> Bruce G. Cochener

Ruth G. Fink also served as president of CGF in July 1988.[2]

Background of Lincoln

Lincoln, a Kansas corporation since 1972, maintains its principal offices in Lincoln, Nebraska. It is a family-owned corporation; most of its stock is held by trusts for the benefit of members of that family. It has been engaged, directly and

_____

[2]The relationships among CGF Industries, Inc. (CGF), and its shareholder—family trusts and their beneficiaries are shown by the following: The children of Ruth G. Fink, president of CGF during July 1988, are Bruce G. Cochener, Diana C. Broze, and Caroline A. Cochener. Each, including their mother, has a trust (or, in some cases, multiple trusts) in his or her name, with family members, within the meaning of sec. 318(a)(1)(A), as bene-ficiaries of the trusts. There are also trusts in the names of Ruth G. Fink's husband (H. Bernerd Fink), stepdaughter (Marcia F. Anderson), and grandchild (Joaquin D. Mason).

through its subsidiaries, in various businesses, including agriculture, petroleum, and the wholesale and retail distribution of textbooks and supplies.

As of December 9, 1988, the following entities owned Lincoln's class A common voting stock:

| Shareholder | Ownership Percentage |
|---|---|
| George A. Lincoln Revocable Trust | 2.9525% |
| Olivia G. Lincoln Revocable Trust | 48.3327 |
| Georgia L. Johnson Revocable Trust | 12.1584 |
| Edward M. Lincoln Revocable Trust | 12.1584 |
| Margaret L. Donlan Revocable Trust | 12.1584 |
| Ann L. Hunter Revocable Trust | 12.2396 |
| Total | 100.0000 |

During calendar year 1988, the following individuals served on Lincoln's board of directors:

> George A. Lincoln, chairman
> Olivia G. Lincoln
> Robert A. Page
> Georgia L. Johnson
> Edward M. Lincoln
> Margaret L. Donlan
> Ann L. Hunter

Serving also as Lincoln's officers during that year were George A. Lincoln as president, Olivia G. Lincoln as vice president, and Bill C. Macy as executive vice president and treasurer.[3]

---

[3]The relationships among Lincoln Industries, Inc. (Lincoln), and its shareholder—family trusts and their beneficiaries are shown by the following:  George A. Lincoln, president of Lincoln in calendar year 1988, and his wife, Olivia G. Lincoln, vice president, each have trusts bearing their names, of which family members, within the meaning of sec. 318(a)(1)(A), are the bene-ficiaries.  There are also trusts in the names of their four children, whose surnames are Johnson, Lincoln, Donlan, and Hunter.

(continued...)

## The Solicitation

By letter dated May 15, 1986, and an addendum dated March 30, 1988, Robert A. Page[4] advised CGF and Lincoln's shareholders on the benefits of a "split purchase of assets". According to Mr. Page, the older generation would buy a life estate or term of years, while the younger generation would purchase the remainder interest. In the addendum, Mr. Page substituted the word "corporation" for "older generation". In his words, the objective of a split purchase[5] was twofold: (1) To transmit property to future generations without incurring a transfer tax

---

[3](...continued)

Familial ties also exist between CGF and Lincoln. Olivia G. Lincoln and Ruth G. Fink, who served as president of CGF in July 1988, are sisters. Their brother is Willard Garvey, president of a corporation named Garvey Industries, Inc.

[4]Robert A. Page was an investment adviser to CGF and Lincoln. His role, however, extended beyond that of just an adviser. Mr. Page served on Lincoln's board of directors, and beginning calendar year 1988, he also served on Lincoln's executive committee. Mr. Page's role was not a passive one. According to the minutes of the board's annual meeting convened Oct. 8-10, 1987, Mr. Page "led an in-depth discussion regarding the current and future operations of Lincoln Industries, Inc."

Mr. Page also has links to CGF and various family trusts. He was vice president of DICO, Inc., a company which merged into CGF effective July 1, 1988, pursuant to a merger agreement and by resolution of CGF's board of directors. Mr. Page also acted as trustee, or in more instances, as successor trustee in a handful of family trusts. According to the trust agreements, the successor trustee assumes the duties of trustee in the event of the trustee's death or inability or unwillingness to serve.

[5]Throughout this opinion, we use the terms "split purchase", "joint purchase", "joint asset acquisition", "joint asset purchase", and "joint investment transaction" interchangeably to mean a situation where person A and person B, for example, simultaneously acquire a present and a future interest in property, respectively.

cost; and (2) to extract corporate assets without incurring a dividend or capital gains tax. The addendum stated that the second described objective was the primary one. Indeed, Mr. Page recognized early on that the overall purpose of the joint purchase was transferring wealth to the remaindermen. As he wrote in the May 15, 1986, letter:

> The purchaser of the term interest or the life estate
> has a lousy deal, which is really the purpose of the
> transaction * * *. The objective is really the same as
> in a private annuity, i.e., doing in the annuitants for
> the benefit of the obligor, in this case it is doing in
> the life tenant for the benefit of the remainderman.

Mr. Page regarded the joint purchase by a closely held corporation and its shareholders of, respectively, a life or income interest and a remainder interest in property to be a favorable device for meeting that objective.

Mr. Page, however, was aware of potential problems which might frustrate a joint purchase, the most important for our purposes being his statement about how a shareholder would fund the remainder interest purchase. Mr. Page warned that "Simultaneous gifts of funds for the acquisition of the [remainder] interest contain an element of risk in collapsing the transaction into one of being a 'retained' interest rather than a 'purchased' interest, in which case the favorable * * * tax results do not occur."[6]  Mr. Page then offered his solution:  "Gifts separated

---

[6]Mr. Page was aware that, when a taxpayer attempts to carve out a term interest in existing property for himself and transfer the remainder interest to a third party, "the holder of the life tenancy or the term interest," as he writes, "would not be able
(continued...)

by time * * * would work." In the addendum of March 30, 1988, he dismissed his prior concern altogether by what he called a "break-through"; namely, the major decline in individual tax rates. This would enable the shareholders to use corporate funds to purchase the remainder interests, albeit at a small tax cost. More specifically, Mr. Page suggested having the corporation declare dividends and make stock redemptions sufficient to generate after-tax funds for the purchase of the remainder interests.

In another letter dated April 6, 1988, Mr. Page described in somewhat greater detail how the joint purchase transaction would take shape.[7] Partnerships would be formed, and, where a corporation purchased a term of years in such newly created partnerships, its shareholders, in turn, would purchase the remainder interests. Attached to the letter, Mr. Page provided a partnership agreement form and supplemental agreements related thereto. In order to make their purchases, the shareholders would receive a major portion of the funds "from the after-tax proceeds of a[n] * * * extraordinary dividend". Although Mr. Page recognized that the amount distributed would be subject to "the so-called double tax * * *, i.e., once when earned by the corporation and again when made available to the corporat[ion's] shareholders", his

---

[6](...continued)
to amortize the cost of that interest for income tax purposes."

[7]Although the letter was addressed to Garvey Industries, Inc., and its shareholders, CGF and Lincoln's shareholders received similar letters from Mr. Page.

words remained encouraging about the success of the transaction because of the decrease in individual and corporate tax rates at that time. Indeed, Mr. Page hastened a final decision by the shareholders on whether to do the transaction or not, when he wrote in the letter:

> The extraordinary dividend route, with a top rate of 28%, is of course much more economical than the prior 50% tax rate. In addition, the 1987 Revenue Act * * * could lead one to believe the utilization of the proposed transaction may have a relatively short life. There is no question in my mind [that] the 28% tax rate, an essential ingredient of the funding method, is a short-term window of opportunity.

Mr. Page recognized that, to the corporation, the proposed transaction was "'not good' in that for ten years all it receives is the ordinary income of the partnership, and at the expiration of the ten-year term, its entire initial investment * * * disappears." But, as to the remaindermen, Mr. Page wrote:

> assuming utilization of the after-tax proceeds from the extraordinary dividend to pay for their remainder interest, the effect is to extract cash from * * * [the corporation] at an approximate 14% tax rate. In addition, if some of you wish for the remainder interest to be acquired by your descendants or remote trusts, the effect is to avoid both estate tax and generation skipping tax if the holder is more than one generation removed.

Mr. Page was careful to note that the success or failure of the joint undertaking depended upon whether "the holders of the remainder interests are * * * 'family members' and not 'strangers'." He then offered his final recommendation: the shareholders, as a group, should participate in the purchase of remainder interests in newly created partnerships.

The CGF Partnerships

In July 1988, CGF formed five limited partnerships under the Kansas Revised Limited Partnership Act: CGF One, L.P.; CGF Two, L.P.; Santa Fe Partners, L.P.; Cloud Grey, L.P.; and Alpha One, L.P. (collectively referred to as the CGF Partnerships).[8] By agreements (the CGF partnership agreements), the CGF Partnerships created a general partner interest and a limited partner interest. In all cases, the general partner owned partnership interest A, and the limited partners owned partnership interest B. The CGF partnership agreements also stated that the term of each partnership would be 20 years.

CGF's shareholder-family trusts and, in one instance, a partnership related to the trusts contributed cash to the CGF Partnerships in exchange for partnership interest A. CGF, in its own right, contributed cash in exchange for 10-year term interests in partnership interest B. Its shareholders or, in some cases, nonshareholder trusts and partnerships related to CGF's shareholders, contributed cash for the remainder interests in partnership interest B. For clarity and because the remaindermen are either CGF shareholders or related thereto, all the remaindermen are sometimes collectively referred to as the CGF Family Trusts. A summary of the various entities making up

---

[8]On July 22, 1988, by resolution of CGF's board of directors, CGF was authorized to purchase 10-year term interests in five partnerships at an aggregate cost of $10,615,000. The resolution also stated that a dividend in the amount of $2,435,925 be paid 1 week later on July 29, 1988.

the CGF Partnerships and their respective contribution amounts is attached to this opinion as appendix A.

The CGF partnership agreements provided that each partnership's net profits and losses were to be borne by the partners in the same percentage as their capital contributions; namely, .1 percent by the holder of partnership interest A and the remaining 99.9 percent by partnership interest B. The CGF partnership agreements also required each partnership to make annual distributions of income, pursuant to the Kansas Uniform Principal and Income Act, and in accordance with the partners' interests in the partnership.

Simultaneously with the execution of the CGF partnership agreements, CGF and the CGF Family Trusts executed separate agreements wherein they set down exactly how partnership interest B would be owned. They agreed that CGF would be the owner of a 10-year term interest in partnership interest B, upon the expiration of which it would become the sole property of the CGF Family Trusts. During the period of its term interest, CGF was entitled to all of the partnership income allocable to partnership interest B, and, upon the expiration of the term interest, the corporation was entitled to all accrued but unpaid income.

CGF and the CGF Family Trusts contributed cash to the CGF Partnerships in the following amounts in exchange for their respective term and remainder interests in partnership interest B:

| Limited Partnership | CGF Contribution | Trust Contribution | Total |
|---|---|---|---|
| CGF One, L.P. | $2,011,312 | $1,265,282 | $3,276,594 |
| CGF Two, L.P. | 1,817,938 | 1,143,632 | 2,961,570 |
| Santa Fe Partners, L.P. | 2,265,250 | 1,425,028 | 3,690,278 |
| Cloud Grey, L.P. | 2,265,250 | 1,425,028 | 3,690,278 |
| Alpha One, L.P. | 2,265,250 | 1,425,028 | 3,690,278 |
| Total | 10,625,000 | 6,683,998 | 17,308,998 |

The amount contributed was computed using the interest rate then contained in the Federal Estate and Gift Tax Regulations for valuing term and remainder interests. See sec. 20.2031-7, Estate Tax Regs.; sec. 25.2512-5, Gift Tax Regs.

In part, the money contributed by CGF's shareholders for their remainder interests in partnership interest B came directly from CGF via cash dividend distributions and stock redemptions. In June and July 1988, CGF made distributions totaling $9,375,000. The table below summarizes CGF's distributions in calendar year 1988 to those shareholders investing in the CGF Partnerships, followed by their respective contribution amounts:

CGF One, L.P.

| Recipient | June 15, 1988 Redemption (Pretax) | July 28, 1988 Redemption (Pretax) | July 29, 1988 Dividend (Pretax) | Total | Partnership Contribution Amount |
|---|---|---|---|---|---|
| H. Bernerd Fink Revocable Trust | -0- | -0- | $11,680 | $11,680 | $12,620 |
| Ruth G. Fink Trust Number One | -0- | -0- | 435,311 | 435,311 | 328,121 |
| Ruth G. Fink Charitable Trust Number One | -0- | -0- | 15,427 | 15,427 | 277,641 |
| Ruth G. Fink Partnership,[1] | | | | | |
|   Ruth G. Fink Revocable Trust, Partner | -0- | -0- | 1,793 | 1,793 | 1,290 |
|     Total | | | | 464,211 | 619,672 |

CGF Two, L.P.

| Recipient | June 15, 1988 Redemption (Pretax) | July 28, 1988 Redemption (Pretax) | July 29, 1988 Dividend (Pretax) | Total | Partnership Contribution Amount |
|---|---|---|---|---|---|
| Marcia F. Anderson Revocable Trust | $255,145 | $230,890 | 14,060 | 500,095 | 330,794 |
| Robert J. Anderson Revocable Trust | 51,315 | -0- | -0- | 51,315 | 34,220 |
| Jane E. Anderson Revocable Trust | 163,680 | -0- | 130,545 | 294,225 | 193,914 |
| Nancy J. Anderson Revocable Trust | 163,680 | -0- | 130,657 | 294,337 | 193,914 |
| Robert J. Anderson, Custodian for | | | | | |
|   Susan M. Anderson | 163,680 | -0- | 130,657 | 294,337 | 193,914 |
| Marcia F. Anderson Trust Number One | 302,500 | -0- | -0- | 302,500 | 193,914 |
|     Total | | | | 1,736,809 | 1,140,670 |

Santa Fe Partners, L.P.

| Recipient | June 15, 1988 Redemption (Pretax) | July 28, 1988 Redemption (Pretax) | July 29, 1988 Dividend (Pretax) | Total | Partnership Contribution Amount |
|---|---|---|---|---|---|
| Caroline A. Cochener Trust | 127,380 | 221,650 | 127,836 | 476,866 | 568,535 |
| Caroline A. Cochener Trust Number Two | -0- | 201,190 | 216,871 | 418,061 | 284,268 |
| Caroline A. Cochener Revocable Trust | 706,365 | -0- | 38,047 | 744,412 | 284,268 |
| Bruce M. Bolene Revocable Trust | 8,635 | -0- | 2,532 | 11,167 | 284,268 |
|     Total | | | | 1,650,506 | 1,421,339 |

Cloud Grey, L.P.

| Recipient | June 15, 1988 Redemption (Pretax) | July 28, 1988 Redemption (Pretax) | July 29, 1988 Dividend (Pretax) | Total | Partnership Contribution Amount |
|---|---|---|---|---|---|
| Diana C. Broze Revocable Trust | -0- | 188,320 | 86,458 | 274,778 | 426,401 |
| Vincent J. Broze Revocable Trust | -0- | 8,635 | 10,127 | 18,762 | 28,427 |
| Joaquin Mason Trust Number One | -0- | 115,940 | 40,885 | 156,825 | 127,920 |
| Joaquin Mason Trust Number Two | -0- | -0- | 144 | 144 | 56,854 |
| Vincent J. Broze, Custodian for | | | | | |
|   Joaquin D. Mason | -0- | 187,550 | 53,225 | 240,775 | 127,920 |
| Diana C. Broze Trust Number Three | -0- | -0- | 108,448 | 108,448 | 28,427 |
| Diana C. Broze Trust Number Four | -0- | -0- | 54,224 | 54,224 | 28,427 |
| Diana C. Broze Trust Number Five | -0- | -0- | 151,827 | 151,827 | 28,427 |
| Diana C. Broze Trust Number Six | 1,100,000 | -0- | -0- | 1,100,000 | 568,535 |
|     Total | | | | 2,105,783 | 1,421,338 |

Alpha One, L.P.

| Recipient | June 15, 1988 Redemption (Pretax) | July 28, 1988 Redemption (Pretax) | July 29, 1988 Dividend (Pretax) | Total | Partnership Contribution Amount |
|---|---|---|---|---|---|
| Alpha, L.P.,[1] | | | | | |
|   Curmudgeon Revocable Trust, Partner | 277,695 | -0- | 9,842 | 287,537 | 188,585 |
|   Nancy M. Cochener Revocable Trust, Partner | 12,705 | 196,900 | -0- | 209,605 | 137,103 |
|   Bruce G. Cochener Trust Number One, Partner | 587,620 | -0- | 413,671 | 1,001,291 | 658,400 |
|   Bruce G. Cochener Trust Number Two, Partner | -0- | -0- | 81,824 | 81,824 | 53,805 |
|   Bruce G. Cochener Trust Number Three, Partner | -0- | -0- | 20 | 20 | 14 |
|   Bruce G. Cochener Trust Number Four, Partner | -0- | 440,000 | -0- | 440,000 | 287,884 |
|     Total | | | | 2,020,277 | 1,325,791 |
|     Grand Total | | | | [2]7,977,586 | 5,928,810 |

[1]This entity, while itself not a shareholder of CGF, has (a) partner(s) that did own shares in CGF.  Thus, viewing the entity as an aggregate of its members, we list the separate contribution amount of such partner(s), along with any distribution amounts made by CGF to the partner(s).

[2]This amount reflects CGF's aggregate distributions in calendar year 1988 to shareholders who contributed to the CGF Partnerships in exchange for the remainder interests in partnership interest B.  Note that this amount is only $139,155 shy of the $7,838,431 of U.S. Government obligations that CGF disposed of in fiscal year 1989.

## The Lincoln Partnerships

On March 31, 1988, Lincoln formed four general partnerships under the laws of the State of Kansas:  Lincoln Partnership #1; Lincoln Partnership #2; Lincoln Partnership #3; and HFC

Partnership.[9]  On October 31, 1988, each general partnership was reorganized as a limited partnership under the Kansas Revised Limited Partnership Act.  Then on December 9, 1988, Lincoln formed five more partnerships under the Kansas Revised Limited Partnership Act:  Lincoln 88 Partnership, L.P.; Lincoln Partnership #11, L.P.; Two Thousand Eight Partnership, L.P.; Donlan Partnership #1, L.P.; and HFC2 Partnership, L.P.[10]  All nine partnerships formed in March and December 1988 are collectively referred to as the Lincoln Partnerships.  The partnership agreement for each Lincoln Partnership (the Lincoln partnership agreements) is similar in many respects to the CGF partnership agreements, in that it created a general partner interest, partnership interest A, and a limited partner interest, partnership interest B.  Pursuant to the Lincoln partnership

---

[9]At a special meeting of Lincoln's board of directors on Feb. 12-16, 1988, Mr. Page moved, and the board unanimously approved, that Lincoln "[make] available up to $6 million for the purchase of separate 10-year term interests".  Mr. Page then offered a second motion to have Lincoln accept a tender offer of 160,000 shares of class B preferred stock at $34 per share between Mar. 16 and Mar. 23, 1988, with payment not later than Mar. 31, 1988.  Once again, the board unanimously approved.  On Mar. 28, 1988, Lincoln distributed $5,440,000 in stock redemptions, 3 days before forming Lincoln Partnership #1, Lincoln Partnership #2, Lincoln Partnership #3, and HFC Partnership.

[10]At a special meeting of Lincoln's board of directors on Oct. 7-8, 1988, a motion was made by Mr. Page, and unanimously carried, that Lincoln "purchase term interests in up to five partnerships at an aggregate amount to be determined at a later date."  Mr. Page also moved that Lincoln distribute $5,500,000 in dividends on Oct. 31, 1988.  This motion, too, was unanimously carried.  Then, approximately 1 month after this board meeting, another meeting of Lincoln's board of directors was held on Nov. 14, 1988, during which the board approved the purchase of term interests in five additional partnerships for $21 million.

agreements, the term of the first four partnerships created was limited to 20 years, and the term of the last five partnerships created was 30 years.

Lincoln's shareholder-family trusts contributed cash to the Lincoln Partnerships in exchange for partnership interest A. Lincoln, in its own right, contributed cash in exchange for 10-year term interests in four Lincoln Partnerships and 20-year term interests in the remaining five Lincoln Partnerships (collectively referred to as the Lincoln term interests). Lincoln's term interests were, in all cases, designated term interests in partnership interest B. Lincoln's shareholder-family trusts or, in one instance, a limited partnership related to the former contributed cash for the remainder interests in partnership interest B. For convenience, all the remaindermen in the Lincoln Partnerships are sometimes collectively referred to as the Lincoln Family Trusts. The list of entities making up the Lincoln Partnerships and their respective contribution amounts is attached to this opinion as appendix B.

The Lincoln partnership agreements required the partners to bear their respective partnerships' net profits and losses in the same percentage as their capital contributions. Thus, six of the Lincoln partnership agreements allocated 1 percent of net profits and losses to the holder of partnership interest A and the remaining 99 percent to partnership interest B, while the other three Lincoln partnership agreements, like the CGF partnership agreements, allocated .1 percent to partnership interest A and

the remaining 99.9 percent to partnership interest B. The Lincoln Partnerships, like their CGF counterparts, were also required to make annual distributions of income, pursuant to the Kansas Uniform Principal and Income Act, and in accordance with the partners' interests in the partnerships.

Simultaneously with the execution of the Lincoln partnership agreements, Lincoln and the Lincoln Family Trusts executed separate agreements for each partnership detailing how partnership interest B would be owned. Four of the nine agreements stated that Lincoln would own partnership interest B during the first 10 years of forming the partnership, after which partnership interest B would become the sole property of the Lincoln Family Trusts. The remaining five agreements stated that Lincoln would own partnership interest B for a term of 20 years from the date of its capital contribution, after which the Lincoln Family Trusts would become sole owners of the interest. During the period of the Lincoln term interests, Lincoln would be entitled to all of partnership interest B's share of partnership distributions.

Lincoln and the Lincoln Family Trusts made the following cash contributions to the Lincoln Partnerships in exchange for their respective term and remainder interests in partnership interest B:

| Limited Partnership | Lincoln Contribution | Term Interest | Trust Contribution | Total |
|---|---|---|---|---|
| Lincoln Partnership #1, L.P. | $1,500,000 | 10 years | $941,180 | $2,441,180 |
| Lincoln Partnership #2, L.P. | 1,500,000 | 10 years | 941,180 | 2,441,180 |
| Lincoln Partnership #3, L.P. | 1,500,000 | 10 years | 941,180 | 2,441,180 |
| HFC Partnership, L.P. | 1,500,000 | 10 years | 941,009 | 2,441,009 |
| Lincoln 88 Partnership, L.P. | 3,360,000 | 20 years | 586,645 | 3,946,645 |
| Lincoln Partnership #11, L.P. | 4,410,000 | 20 years | 769,972 | 5,179,972 |
| Two Thousand Eight Partnership, L.P. | 4,410,000 | 20 years | 769,972 | 5,179,972 |
| Donlan Partnership #1, L.P. | 4,410,000 | 20 years | 769,972 | 5,179,972 |
| HFC2 Partnership, L.P. | 4,410,000 | 20 years | 769,972 | 5,179,972 |
| Total | 27,000,000 | | 7,431,082 | 34,431,082 |

In calculating the contribution amounts, Lincoln and the Lincoln Family Trusts used the actuarial tables set forth in the Federal Estate and Gift Tax Regulations to value their respective term and remainder interests.

The cash contributed by Lincoln's shareholders for their remainder interests in partnership interest B came, in part, from Lincoln via cash dividend distributions and stock redemptions. In March, July, and October 1988, Lincoln made distributions totaling $12,040,000. At the beginning of the year, in January, 1988, Lincoln also called 116,857 shares of its class A preferred stock in the amount of $6,427,135. Thus, during calendar year 1988, Lincoln engaged in stock transactions totaling $18,467,135. Lincoln funded this amount by withdrawing money from its investment in Net Venture, a partnership investing solely in U.S. Government obligations.[11] See discussion of Net Venture, infra.

---

[11]During January 1988, when Lincoln called $6,427,135 worth of its class A preferred stock, it also made a cash withdrawal of $6,600,000 from its capital account with Net Venture (capital withdrawal). On Mar. 28, 1988, the same day that Lincoln redeemed $5,440,000 worth of its stock, it also made a $5,500,000 capital withdrawal. A few days later, on Mar. 31, 1988, Lincoln made another capital withdrawal of $6,800,000. Less than 1 month

(continued...)

The following is a summary of Lincoln's distribution activity and the corresponding contribution amounts paid by Lincoln's shareholders for their remainder interests in the Lincoln Partnerships:

_____

[11](...continued)
before declaring a $1,100,000 dividend on June 1, 1988, Lincoln made two more capital withdrawals totaling $10 million, one on May 6, 1988, in the amount of $5 million, and the other on May 17, 1988, also of $5 million.  On Oct. 31, 1988, the same day that Lincoln paid a $5,500,000 dividend to its shareholders, another $1,305,000 withdrawal was charged to Lincoln's capital account with Net Venture.

## Lincoln Partnership #1, L.P.

| Recipient | Jan. 1988 Call Option (Pretax) | Mar. 1988 Redemption (Pretax) | June 1988 Dividend (Pretax) | Oct. 1988 Dividend (Pretax) | Total | Partnership Contribution Amount |
|---|---|---|---|---|---|---|
| Georgia L. Johnson Revocable Trust | $1,164,295 | $1,360,000 | $45,163 | $249,314 | $2,818,772 | $938,739 |
| Georgia L. Johnson Trust Number Four | -0- | -0- | 24,587 | 122,936 | 147,523 | 2,441 |
| Total | | | | | 2,966,295 | 941,180 |

## Lincoln Partnership #2, L.P.

| Recipient | Jan. 1988 Call Option (Pretax) | Mar. 1988 Redemption (Pretax) | June 1988 Dividend (Pretax) | Oct. 1988 Dividend (Pretax) | Total | Partnership Contribution Amount |
|---|---|---|---|---|---|---|
| Edward M. Lincoln Revocable Trust | 1,170,235 | 474,028 | 45,829 | 252,642 | 1,942,734 | 117,647 |
| Edward M. Lincoln Trust Number Two | -0- | 35,972 | 4,766 | 23,831 | 64,569 | 235,295 |
| Edward M. Lincoln Trust Number Three | -0- | -0- | 47,511 | 237,558 | 285,069 | 235,295 |
| Edward M. Lincoln Trust Number Seven | -0- | 510,000 | -0- | -0- | 510,000 | 117,647 |
| Lincoln Family Trust Number Two | -0- | 340,000 | 38,895 | 194,475 | 573,370 | 235,295 |
| Total | | | | | 3,375,742 | 941,179 |

## Lincoln Partnership #3, L.P.

| Recipient | Jan. 1988 Call Option (Pretax) | Mar. 1988 Redemption (Pretax) | June 1988 Dividend (Pretax) | Oct. 1988 Dividend (Pretax) | Total | Partnership Contribution Amount |
|---|---|---|---|---|---|---|
| Margaret L. Donlan Revocable Trust | 675,235 | 1,360,000 | 45,559 | 251,293 | 2,332,087 | 739,782 |
| Margaret L. Donlan Trust Number Five | 495,000 | -0- | -0- | -0- | 495,000 | 201,397 |
| Total | | | | | 2,827,087 | 941,179 |

## HFC Partnership, L.P.

| Recipient | Jan. 1988 Call Option (Pretax) | Mar. 1988 Redemption (Pretax) | June 1988 Dividend (Pretax) | Oct. 1988 Dividend (Pretax) | Total | Partnership Contribution Amount |
|---|---|---|---|---|---|---|
| Ann L. Hunter Trust Number Two | -0- | -0- | 167 | 1,292 | 1,459 | 37,640 |
| Lincoln Family Trust Number Four | -0- | 1,360,000 | 36,405 | 182,025 | 1,578,430 | 903,369 |
| Total | | | | | 1,579,889 | 941,009 |

## Lincoln 88 Partnership, L.P.

| Recipient | Jan. 1988 Call Option (Pretax) | Mar. 1988 Redemption (Pretax) | June 1988 Dividend (Pretax) | Oct. 1988 Dividend (Pretax) | Total | Partnership Contribution Amount |
|---|---|---|---|---|---|---|
| Olivia G. Lincoln Revocable Trust | 1,358,170 | -0- | 8,824 | 44,121 | 1,411,115 | 170,127 |
| Olivia G. Lincoln Trust Number One | -0- | -0- | 20,028 | 100,140 | 120,168 | 82,130 |
| Olivia G. Lincoln Trust Number Two | -0- | -0- | 20,028 | 100,140 | 120,168 | 82,130 |
| Olivia G. Lincoln Trust Number Three | -0- | -0- | 20,028 | 100,140 | 120,168 | 82,130 |
| Olivia G. Lincoln Trust Number Four | -0- | -0- | 20,028 | 100,140 | 120,168 | 82,130 |
| George A. Lincoln Trust Number One | -0- | -0- | 7,112 | 35,559 | 42,671 | 29,332 |
| George A. Lincoln Trust Number Two | -0- | -0- | 7,112 | 35,559 | 42,671 | 29,332 |
| George A. Lincoln Trust Number Three | -0- | -0- | 7,112 | 35,559 | 42,671 | 29,332 |
| Total | | | | | 2,019,800 | 586,643 |

## Lincoln Partnership #11, L.P.

| Recipient | Jan. 1988 Call Option (Pretax) | Mar. 1988 Redemption (Pretax) | June 1988 Dividend (Pretax) | Oct. 1988 Dividend (Pretax) | Total | Partnership Contribution Amount |
|---|---|---|---|---|---|---|
| Georgia L. Johnson Revocable Trust | [1] | [1] | [1] | [1] | [1] | 269,490 |
| Georgia L. Johnson Trust Number Two | -0- | -0- | 53,465 | 267,327 | 320,792 | 223,292 |
| Total | | | | | 320,792 | 492,782 |

## Two Thousand Eight Partnership, L.P.

| Recipient | Jan. 1988 Call Option (Pretax) | Mar. 1988 Redemption (Pretax) | June 1988 Dividend (Pretax) | Oct. 1988 Dividend (Pretax) | Total | Partnership Contribution Amount |
|---|---|---|---|---|---|---|
| Edward M. Lincoln Revocable Trust | [1] | [1] | [1] | [1] | [1] | 123,196 |
| Edward M. Lincoln Trust Number Two | [1] | [1] | [1] | [1] | [1] | 19,249 |
| Edward M. Lincoln Trust Number Three | [1] | [1] | [1] | [1] | [1] | 160,154 |
| Edward M. Lincoln Trust Number Four | -0- | -0- | 11,522 | 57,608 | 69,130 | 46,198 |
| Edward M. Lincoln Trust Number Five | -0- | -0- | 27,483 | 137,417 | 164,900 | 115,496 |
| Edward M. Lincoln Trust Number Six | -0- | -0- | 47,512 | 237,558 | 285,070 | 200,193 |
| Lincoln Family Trust Number Two | [1] | [1] | [1] | [1] | [1] | 105,486 |
| Total | | | | | 519,100 | 769,972 |

## Donlan Partnership #1, L.P.

| Recipient | Jan. 1988 Call Option (Pretax) | Mar. 1988 Redemption (Pretax) | June 1988 Dividend (Pretax) | Oct. 1988 Dividend (Pretax) | Total | Partnership Contribution Amount |
|---|---|---|---|---|---|---|
| Margaret L. Donlan Revocable Trust | [1] | [1] | [1] | [1] | [1] | 415,785 |
| Margaret L. Donlan Trust Number Two | -0- | -0- | 29,314 | 146,569 | 175,883 | 121,271 |
| Margaret L. Donlan Trust Number Three | -0- | -0- | 72,455 | 362,276 | 434,731 | 115,496 |
| Margaret L. Donlan Trust Number Five | [1] | [1] | [1] | [1] | [1] | 177,421 |
| Total | | | | | 610,614 | 829,973 |

## HFC2 Partnership, L.P.

| Recipient | Jan. 1988 Call Option (Pretax) | Mar. 1988 Redemption (Pretax) | June 1988 Dividend (Pretax) | Oct. 1988 Dividend (Pretax) | Total | Partnership Contribution Amount |
|---|---|---|---|---|---|---|
| Ann L. Hunter Revocable Trust | 654,500 | -0- | 74,268 | 394,381 | 1,123,149 | 269,490 |
| Ann L. Hunter Trust Number Three | -0- | -0- | 81,324 | 406,620 | 487,944 | 307,989 |
| Ann L. Hunter Trust Number Four | -0- | -0- | 45,690 | 228,451 | 274,141 | 153,994 |
| Ann L. Hunter Trust Number Twenty-six | 605,000 | -0- | -0- | -0- | 605,000 | 38,499 |
| Total | | | | | 2,490,234 | 769,972 |
| Grand Total | | | | | [2]16,709,553 | 7,213,889 |

[1]As this trust is also a remainderman in another Lincoln Partnership, the distribution amount is not noted here since it has already been recorded above. This is necessary to avoid counting twice the same distribution amount.

[2]This amount reflects Lincoln's aggregate distributions in calendar year 1988 to shareholders who contributed to the Lincoln Partnerships in exchange for the remainder interests in partnership interest B.

Partnership Investments

The CGF and Lincoln Partnerships invested the partners' capital contributions, directly and through investment partnerships, in U.S. Government bonds, short-term fixed income obligations, and marketable securities, and in various businesses, including precious metals, real estate, natural gas, and hotel management.  During CGF's taxable years in issue, the CGF Partnerships, when examined collectively, invested most of their assets in the following four investment partnerships:  Net Venture, Gopher Fund, Lake Union Hotel Associates Ltd. Partnership (Lake Union), and GAR Ninety.  The specific dollar amounts, with corresponding percentage figures in parentheses, that each CGF Partnership invested in the above-mentioned investment partnerships are set forth in appendix C.

During Lincoln's taxable years in issue, the Lincoln Partnerships, when taken as a whole, invested most of their assets in Net Venture, Gopher Fund, Gill Industries, L.P., and Falcon Fund. Appendix D is a table showing the dollar amounts, with corresponding percentage figures in parentheses, that each Lincoln Partnership invested in the investment partnerships just listed.

Net Venture was a general partnership formed on November 29, 1985, between a corporation named Garvey, Inc., with Robert A. Page as president, and four trusts; i.e., Olive W. Garvey Revocable Trust, Ruth G. Fink Revocable Trust, Olivia G. Lincoln Revocable Trust, and George A. Lincoln Revocable Trust. According to its partnership agreement, its business purpose was

investing solely "in <u>direct</u> obligations of the United States Government, with the exception of very short-term temporary investments in other fixed income type instruments pending investment in direct United States obligations."  The partnership agreement states further that the maximum maturity of any instrument will be 3 years.[12]

The Gopher Fund was a general partnership formed on January 2, 1981, to invest in securities.  Among its founding partners were Garvey, Inc., with Robert A. Page as president, numerous trusts bearing the Garvey name, and a few CGF shareholders.

Lake Union, a limited partnership formed on December 1, 1989, to acquire, develop, operate, and manage hotels, had four CGF Partnerships as limited partners; namely, CGF One, L.P., CGF Two, L.P., Cloud Grey, L.P., and Alpha One, L.P.

GAR Ninety, a general partnership between Garvey, Inc., and GAR Four, a partnership of which Garvey, Inc., was managing partner, was formed on June 17, 1988.  Under the GAR Ninety partnership agreement, Robert A. Page's name was the only one required as a signatory to the agreement.  GAR Ninety's business purpose was "making investments in gold, and pending such investments, <u>direct</u> obligations of the United States Government, or Partnerships so investing, with the exception of very short-

---

[12]On Mar. 31, 1992, Net Venture's partnership agreement was amended to provide that the maximum maturity of any investment would be 5 years, and the maximum average maturity of all of its investments would not exceed 3 years.

term temporary investments in other fixed income type instru-ments."

Gill Industries, L.P., formed on June 19, 1989, by two Lincoln shareholder-family trusts, a non-shareholder-family trust, and two Lincoln Partnerships, was in the sheet metal business.  Falcon Fund was a general partnership formed on January 31, 1991, to invest in securities.  Its founding partners were Mosby Lincoln, Inc., a Kansas corporation, two Lincoln Partnerships, and a Lincoln shareholder-family trust.

Financial Performance of the CGF and Lincoln Partnerships

On CGF's Federal income tax returns for the taxable years ending March 31, 1989 through 1992, CGF reported the income and expenses of owning term interests in the CGF Partnerships as follows:

| | Mar. 31, 1989 | Mar. 31, 1990 | Mar. 31, 1991 | Mar. 31, 1992 | Totals |
|---|---|---|---|---|---|
| **CGF One, L.P.** | | | | | |
| Income | $87,610 | $247,242 | $225,118 | $186,311 | $746,281 |
| Expenses [1] | (9,113) | (22,926) | (21,654) | (20,373) | (74,066) |
| Amortization expense | (134,088) | (201,131) | (201,131) | (201,131) | (737,481) |
| Net income or loss | (55,591) | 23,185 | 2,333 | (35,193) | (65,266) |
| **CGF Two, L.P.** | | | | | |
| Income | 82,625 | 233,708 | 214,574 | 179,041 | 709,948 |
| Expenses [1] | (7,044) | (19,828) | (18,383) | (18,147) | (63,402) |
| Amortization expense | (121,196) | (181,794) | (181,794) | (181,794) | (666,578) |
| Net income or loss | (45,615) | 32,086 | 14,397 | (20,900) | (20,032) |
| **Santa Fe Partners, L.P.** | | | | | |
| Income | 106,683 | 294,733 | 269,836 | 226,920 | 898,172 |
| Expenses [1] | (10,453) | (22,883) | (24,046) | (22,453) | (79,835) |
| Amortization expense | (151,017) | (226,525) | (226,525) | (226,525) | (830,592) |
| Net income or loss | (54,787) | 45,325 | 19,265 | (22,058) | (12,255) |
| **Cloud Grey, L.P.** | | | | | |
| Income | 102,808 | 291,338 | 264,831 | 215,715 | 874,692 |
| Expenses [1] | (10,336) | (24,333) | (22,992) | (21,873) | (79,534) |
| Amortization expense | (151,017) | (226,525) | (226,525) | (226,525) | (830,592) |
| Net income or loss | (58,545) | 40,480 | 15,314 | (32,683) | (35,434) |
| **Alpha One, L.P.** | | | | | |
| Income (or loss) | 109,328 | 281,435 | (42,355) | (280,272) | 68,136 |
| Expenses [1] | (8,045) | (35,338) | (16,421) | (7,169) | (66,973) |
| Amortization expense | (151,017) | (226,525) | (226,525) | (226,525) | (830,592) |
| Net income or loss | (49,734) | 19,572 | (285,301) | (513,966) | (829,429) |

[1]These amounts reflect CGF's allocations of portfolio income expense and investment interest expense, as reflected on CGF's Schedules K-1 for the years in issue.

Over this 4-year period, CGF's total amortization deductions exceeded its allocations of partnership income by $598,606 (income of $3,297,229 and amortization deductions of $3,895,835). Respondent disallowed all of CGF's amortization deductions in connection with owning term interests in partnership interests B for such years.

Lincoln reported the following income and expenses of owning term interests in the Lincoln Partnerships for the taxable years ending March 31, 1989 through 1993:

| | Mar. 31, 1989 | Mar. 31, 1990 | Mar. 31, 1991 | Mar. 31, 1992 | Mar. 31, 1993 | Totals |
|---|---|---|---|---|---|---|
| **Lincoln Partnership #1, L.P.** | | | | | | |
| Income | $149,050 | $198,129 | $187,277 | $169,864 | $116,424 | 820,744 |
| Expenses [1] | (15,127) | (13,252) | (12,476) | (34,994) | (38,341) | (114,190) |
| Amortization expense | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (750,000) |
| Net income or loss | (16,077) | 34,877 | 24,801 | (15,130) | (71,917) | (43,446) |
| **Lincoln Partnership #2, L.P.** | | | | | | |
| Income | 149,136 | 221,869 | 209,500 | 163,287 | 129,907 | 873,699 |
| Expenses | (14,531) | (46,993) | (36,626) | (36,584) | (38,645) | (173,379) |
| Amortization expense | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (750,000) |
| Net income or loss | (15,395) | 24,876 | 22,874 | (23,297) | (58,738) | (49,680) |
| **Lincoln Partnership #3, L.P.** | | | | | | |
| Income | 149,038 | 200,833 | 203,125 | 186,726 | 127,427 | 867,149 |
| Expenses [1] | (14,535) | (30,951) | (52,987) | (46,259) | (40,085) | (184,817) |
| Amortization expense | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (750,000) |
| Net income or loss | (15,497) | 19,882 | 138 | (9,533) | (62,658) | (67,668) |
| **HFC Partnership, L.P.** | | | | | | |
| Income | 149,060 | 125,176 | 48,272 | 81,548 | 139,338 | 543,394 |
| Expenses [1] | (39,298) | (67,798) | (60,875) | (60,994) | (41,798) | (270,763) |
| Amortization expense | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (750,000) |
| Net income or loss | (40,238) | (92,622) | (162,603) | (129,446) | (52,460) | (477,369) |
| **Lincoln 88 Partnership, L.P.** | | | | | | |
| Income | 26,756 | 343,078 | 356,683 | 326,129 | 284,163 | 1,336,809 |
| Expenses [1] | (5,824) | (20,970) | (19,566) | (18,513) | (19,875) | (84,748) |
| Amortization expense | (42,000) | (168,000) | (168,000) | (168,000) | (168,000) | (714,000) |
| Net income or loss | (21,068) | 154,108 | 169,117 | 139,616 | 96,288 | 538,061 |
| **Lincoln Partnership #11, L.P.** | | | | | | |
| Income | 57,738 | 473,567 | 454,991 | 422,188 | 357,760 | 1,766,244 |
| Expenses [1] | (9,499) | (41,996) | (25,881) | (81,238) | (82,297) | (240,911) |
| Amortization expense | (55,125) | (220,500) | (220,500) | (220,500) | (220,500) | (937,125) |
| Net income or loss | (6,886) | 211,071 | 208,610 | 120,450 | 54,963 | 588,208 |
| **Two Thousand Eight Partnership, L.P.** | | | | | | |
| Income | 11,181 | 469,729 | 454,248 | 381,249 | 302,874 | 1,619,281 |
| Expenses | (1,552) | (39,747) | (76,534) | (76,202) | (78,240) | (272,275) |
| Amortization expense | (55,125) | (220,500) | (220,500) | (220,500) | (220,500) | (937,125) |
| Net income or loss | (45,496) | 209,482 | 157,214 | 84,547 | 4,134 | 409,881 |
| **Donlan Partnership #1, L.P.** | | | | | | |
| Income | 11,181 | 469,741 | 461,009 | 423,668 | 296,173 | 1,661,772 |
| Expenses [1] | (1,586) | (60,338) | (91,066) | (89,907) | (75,460) | (318,357) |
| Amortization expense | (55,125) | (220,500) | (220,500) | (220,500) | (220,500) | (937,125) |
| Net income or loss | (45,530) | 188,903 | 149,443 | 113,261 | 213 | 406,290 |
| **HFC2 Partnership, L.P.** | | | | | | |
| Income | 11,226 | 267,163 | 137,798 | 187,255 | 287,858 | 891,300 |
| Expenses [1] | (51,336) | (132,790) | (118,742) | (118,573) | (76,472) | (497,913) |
| Amortization expense | (55,125) | (220,500) | (220,500) | (220,500) | (220,500) | (937,125) |
| Net income or loss | (95,235) | (86,127) | (201,444) | (151,818) | (9,114) | (543,738) |

[1]These amounts reflect Lincoln's allocations of portfolio income expense and investment interest expense, as reflected on Lincoln's Schedules K-1 for the years in issue.

Over this 5-year period, Lincoln's allocations of partnership income exceeded its amortization deductions by $2,917,892 (income of $10,380,392 and amortization deductions of $7,462,500).

Respondent disallowed all of Lincoln's amortization deductions in connection with owning the Lincoln term interests.

Discussion

The issue we must decide is whether CGF and its subsidiaries and Lincoln and its subsidiaries are entitled to amortize their costs of acquiring term interests in partnerships. Petitioners argue that they acquired expiring interests in property, and, since their interests are wasting assets, that they are entitled to recover their costs through amortization deductions. Petitioners go on to argue that they and the Family Trusts (meaning the CGF Family Trusts and the Lincoln Family Trusts collectively) engaged in arm's-length transactions since petitioners acquired only term interests in partnerships and based their purchase prices on present value tables then contained in the Federal regulations.

Respondent contends that petitioners and the Family Trusts engaged in a tax scheme whose main purpose was to extract money from the corporations without the incidence of taxation. Respondent asserts that the transactions lacked business purpose and economic substance since petitioners had no reasonable expectation of making a profit. Respondent argues further that, since petitioners supplied a substantial portion of the money used to acquire the remainder interests, the substance of the transactions was the acquisition by petitioners of partnership interests B in their entirety and a carving out of the remainders to the Family Trusts. Thus, respondent concludes that petitioners have

attempted to create amortization deductions by impermissibly splitting nondepreciable assets; namely, partnership interests in newly created partnerships. Petitioners counter that the substance of the transactions coincides with its form in that they and the Family Trusts separately acquired their respective term and remainder interests with separate funds.

As a general rule, a taxpayer who purchases a term interest in property which is used in a trade or business or held for the production of income is entitled to deduct ratably the cost of that interest over its expected life.[13] See, e.g., Early v. Commissioner, 445 F.2d 166, 169 (5th Cir. 1971), revg. on another ground 52 T.C. 560 (1969); Manufacturers Hanover Trust Co. v. Commissioner, 431 F.2d 664 (2d Cir. 1970), affg. T.C. Memo. 1969-132; 1220 Realty Co. v. Commissioner, 322 F.2d 495, 498 (6th Cir. 1963), affg. in part and revg. in part T.C. Memo. 1962-67. This principle applies even though the property underlying the term interest is not depreciable. See, e.g., Early v. Commissioner, supra; Manufacturers Hanover Trust Co. v. Commissioner, supra; 1220 Realty Co. v. Commissioner, supra; Elrick v. Commissioner, 56 T.C. 903 (1971), revd. on another ground 485 F.2d 1049 (D.C. Cir. 1973). It is also clear that, where a taxpayer, without

---

[13]An exception to the general rule is sec. 167(e) (as amended and in effect currently), which prohibits a taxpayer from amortizing a term interest where a related person holds the remainder interest. This section, however, applies only to term interests acquired or created after July 27, 1989. Since petitioners' term interests were created before that date, sec. 167(e) is inapplicable to the present cases.

additional investment, divides nondepreciable property into two parts, one of them being a term interest, amortization deductions are not allowable.  Lomas Santa Fe, Inc. v. Commissioner, 693 F.2d 71 (9th Cir. 1982), affg. 74 T.C. 662 (1980); United States v. Georgia R.R. & Banking Co., 348 F.2d 278, 287-289 (5th Cir. 1965); Gordon v. Commissioner, 85 T.C. 309 (1985).

In these cases, the properties in question are partnership interests, a type of property generally considered to be non-amortizable.  In form, petitioners acquired term interests in limited partnerships, while the Family Trusts acquired the remainders.  We must decide whether the transactions are in substance what they appear to be in form.

The precedents in Kornfeld v. Commissioner, 137 F.3d 1231 (10th Cir. 1998), affg. T.C. Memo. 1996-472, and Gordon v. Commissioner, supra, require examination of all the singular steps of a joint asset purchase to determine whether, in substance, one party acquired full ownership of property and carved out a remainder interest for related parties, or whether related parties separately, and yet simultaneously, acquired term and remainder interests in property, respectively.  It is a well-settled principle that formally separate steps in an integrated series, focused toward a particular result, may be amalgamated and treated as part of a single transaction.[14]  See Kornfeld v. Commissioner, supra at 1235 (citing Commissioner v. Clark, 489

[14]This rule is often referred to as the step transaction doctrine.

U.S. 726, 738 (1989)); Gordon v. Commissioner, supra at 324

(citing Commissioner v. Court Holding Co., 324 U.S. 331, 334

(1945); Helvering v. Clifford, 309 U.S. 331, 334 (1940); Grif-

fiths v. Helvering, 308 U.S. 355, 357-358 (1939); Professional

Servs. v. Commissioner, 79 T.C. 888, 913 (1982)).

While we are not required to sustain respondent's determina-

tions solely because tax reasons affected the way in which

petitioners structured the transaction, see Kornfeld v. Commis-

sioner, T.C. Memo. 1996-472, petitioners have the burden of

proving that respondent's determinations are erroneous, Rule

142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Where, as

here, the parties to the transactions are related, the level of

skepticism as to the form of the transaction is heightened,

"because of the greater potential for complicity between related

parties in arranging their affairs in a manner devoid of legiti-

mate motivations." Vaughn v. Commissioner, 81 T.C. 893, 908

(1983) (citing Bowen v. Commissioner, 78 T.C. 55, 78 (1982),

affd. 706 F.2d 1087 (11th Cir. 1983)).

We have confronted this same issue several times before in a

variety of contexts. In deciding these cases, we have undertaken

an intensely factual analysis of the substance of each

transaction. See, e.g., Kornfeld v. Commissioner, T.C. Memo.

1996-472; Gordon v. Commissioner, supra at 326-327; Lomas Santa

Fe, Inc. v. Commissioner, 74 T.C. at 681. Therefore, we believe

a brief review of the cases previously decided will paint a more

complete picture and identify factors leading to our decision herein.

In United States v. Georgia R.R. & Banking Co., supra, the corporate taxpayer had leased certain of its stock holdings to a third party for 99 years in return for $600,000 annually. Approximately 73 years into the lease, the taxpayer distributed its reversionary interest in the stock to its shareholders as a dividend in kind.  Thus the corporation retained its present right to the lease payments, while its shareholders received a remainder interest in the stock itself.  The taxpayer then sought to amortize over the remaining term of the lease its adjusted basis in the stock, after charging off that portion of basis representing the transferred remainder interest.  After noting that the underlying property would not have been exhausted when the lease finally terminated, the court held that the leasehold the taxpayer had created was not depreciable, inasmuch as the taxpayer had incurred no additional costs in obtaining it.  The court also concluded that the dividend distribution of the reversion also did not make the retained "lease" a depreciable asset.  In the words of the court:  "By distributing the reversion in 1954, taxpayer did nothing more than split its bundle of property rights into two parts.  We cannot see how this action on its part can result in a depreciable asset where none previously existed, unless it made some additional investment." Id. at 288.

In <u>Lomas Santa Fe, Inc. v. Commissioner</u>, 693 F.2d 71 (9th Cir. 1982), the corporate taxpayer purchased land in fee simple on which it planned to develop a luxury community. For State law reasons, the taxpayer formed a subsidiary and transferred that portion of the land designated as a golf course and country club to the subsidiary, while retaining a 40-year term interest in the golf course. The taxpayer then sought to amortize its basis in the term interest over 40 years. Relying on <u>United States v. Georgia R.R. & Banking Co.</u>, <u>supra</u>, the court held that a taxpayer who holds nondepreciable property (the golf course) in fee simple may not create a depreciable asset by carving out a term interest for itself and conveying the remainder to a third party.

<u>Gordon v. Commissioner</u>, <u>supra</u>, presented a somewhat analogous situation to the one at hand. Dr. Gordon, the taxpayer, had established a family trust for the benefit of his minor children. Upon the advice of his lawyers, he agreed to participate in an investment scheme geared for professionals having qualified pension or profit-sharing trusts. The arrangement called for joint purchases of tax-exempt bonds. The professional would purchase at fair market value a life estate in the bond, and the trust would purchase the remainder interest. According to Dr. Gordon's lawyers, it would give him "'a substantial tax-free cash flow during his life, a proportionate tax deduction over his life expectancy of his cost of acquisition, and a reduction of his taxable estate.'" <u>Id.</u> at 311.

Under the arrangement, Dr. Gordon purchased life interests in tax-exempt bonds, while the family trust simultaneously purchased the remainder interests, with the funds provided, in large part, by Dr. Gordon. The taxpayer then sought to amortize the cost of his income interest ratably over his expected life. We held that, while, in form, the taxpayer had acquired a depreciable income interest, in substance, he purchased full ownership of the bonds and donated the remainder interests to the trust. Id. at 330-331.

Invoking the step transaction doctrine to ignore the shift of funds from Dr. Gordon to the family trust, the Court concluded that "Dr. Gordon bought the whole bonds, using the family trust as a mere stopping place for a portion of their purchase prices." Id. at 328. We reasoned further that, although the trust owned stock holdings which would have provided it with sufficient cash to participate in the joint bond purchases, "the trust made no real purchases, but was merely a way station for the accumulation of cash provided for the most part by * * * [Dr. Gordon]." Id. Consequently, applying the rationale of Lomas Santa Fe, Inc. v. Commissioner, supra, and United States v. Georgia R.R. & Banking Co., 348 F.2d 278 (5th Cir. 1965), we disallowed Dr. Gordon's amortization deductions of his life interests in the bonds.

Kornfeld v. Commissioner, 137 F.3d 1231 (10th Cir. 1998), was another case involving amortization of a life interest in bonds. Julian Kornfeld, an experienced tax attorney, believed he could structure a transaction which would give him income,

estate, and gift tax benefits.  His method was to enter into agreements with his daughters to buy tax-exempt bonds, with Mr. Kornfeld buying a life estate and his daughters buying the remainder interests.  Mr. Kornfeld, acting through a revocable trust of which he was trustee, executed two such agreements, after which Congress added a provision to the Federal tax law disallowing the amortization of a term interest where the remainder interest is held by a related party.  See supra note 13.  Aware of this change, Mr. Kornfeld amended the later agreements to provide that one of his daughters would take a second life estate in the bonds, and his long-time secretary would take the remainder interest.

Mr. Kornfeld used the valuation tables published by the Internal Revenue Service for estate and gift tax purposes to calculate the respective values of the interests.  He then furnished his daughters and secretary with the amounts necessary to purchase their interests and filed gift tax returns reflecting those amounts.  Thus, as recipients of the gifts, they were not under any legal obligation to use that money to do the joint asset purchase.  As planned, though, they did participate, and Mr. Kornfeld began amortizing ratably over his expected life his cost of acquiring life interests in the bonds.

In analyzing the tax consequences, the Court of Appeals for the Tenth Circuit, the court to which appeals by petitioner CGF Industries, Inc. and Subsidiaries would generally lie, stepped together the intermediate transactions that Mr. Kornfeld

employed, and affirmed our holding that Mr. Kornfeld had acquired full ownership in the bonds and then made a gift of the remainder interests to his daughters and secretary. Id. at 1235. We noted, and the Court of Appeals agreed, that the ability of Mr. Kornfeld's daughters and secretary to use for other purposes the funds he had given them was of minimal significance since the parties operated under an understanding that the joint investment would take place. Id. Thus, the transaction in question was an impermissible attempt to create amortizable term interests out of nondepreciable property, and the amortization deductions claimed by Mr. Kornfeld were, accordingly, disallowed.

The last case, for our purposes, in this line is Richard Hansen Land, Inc. v. Commissioner, T.C. Memo. 1993-248. While facially similar to the situation here, it differs in several significant respects. The taxpayer was a farming corporation wholly owned by Richard E. Hansen, who also served as president of the corporation. Five months after incorporation, the taxpayer and Mr. Hansen jointly purchased land, with the taxpayer buying a 30-year term interest for $211,165, and Mr. Hansen, the taxpayer's shareholder, buying the remainder interest for $12,835. Within 1 to 4 months before this purchase, the taxpayer had transferred wheat valued at $28,416 to Mr. Hansen as wages. Mr. Hansen purchased his remainder interest by using a portion of the proceeds from selling the wheat that he had received as compensation. The corporation then began amortizing its cost of acquiring the term interest in the land.

Richard Hansen Land, Inc. v. Commissioner, supra, like Gordon v. Commissioner, 85 T.C. 309 (1985), and Kornfeld v. Commissioner, T.C. Memo. 1996-472, involved the simultaneous joint acquisition of term and remainder interests in property acquired from a third party. However, we held in Richard Hansen Land, Inc. v. Commissioner, supra, unlike the other two cases, that the taxpayer did not use Mr. Hansen as a "mere stopping place" for the funds used to make the acquisitions. Rather, Mr. Hansen acquired his remainder interest entirely out of his own earnings——by drawing on his personal bank account to make the purchase. Although a portion of that amount constituted the proceeds of selling the wheat he had received as wages, it was more important that such wages were due and owing to Mr. Hansen and separate, in our view, from the joint purchase that followed. The taxpayer had an obligation to pay Mr. Hansen for his work in the taxpayer's farming and ranching business, a point which the Commissioner had conceded, regardless of whether Mr. Hansen chose to participate in a joint asset purchase. As we noted in our opinion: "Mr. Hansen rendered services to * * * [the taxpayer], and there is nothing in the record that would indicate that the transfer of wheat by * * * [the taxpayer] to Mr. Hansen repre- sented anything other than wages." Id. The acquisitions of the term and remainder interests by, respectively, the corporation and Mr. Hansen, its sole shareholder, "'were in fact what they appear to be in form.'" Id. (quoting Hobby v. Commissioner, 2 T.C. 980, 985 (1943)).

With the foregoing in mind, we must decide whether petitioners and the Family Trusts separately and independently invested in the limited partnerships or whether petitioners, in substance, acquired partnership interests B in their entirety, retaining term interests, and transferring the remainders to the Family Trusts.  On the basis of the record before us, we conclude that petitioners acquired the full partnership interests outright, and that the rationale of Lomas Santa Fe, Inc. v. Commissioner, 693 F.2d 71 (9th Cir. 1982), and United States v. Georgia R.R. & Banking Co., 348 F.2d 278 (5th Cir. 1965), applies to deny petitioners their amortization deductions of term interests in the CGF and Lincoln Partnerships.

As mentioned earlier in this opinion, Gordon v. Commissioner, supra at 326-327, and Kornfeld v. Commissioner, 137 F.3d 1231 (10th Cir. 1998), highlight the manner in which we are to dispose of the instant cases; i.e., by examining closely the transactions in question in order to ascertain whether they were really prearranged steps of a single transaction, cast from the outset to achieve an ultimate result.[15]  This examination is intensely factual.

---

[15]This formulation of the step transaction doctrine describes the "end result" test, one of three alternative tests used for determining when and how to apply this doctrine in a given situation.  For a summary of the step transaction doctrine and its three approaches, see our discussion in Penrod v. Commissioner, 88 T.C. 1415, 1428-1430 (1987).  Both Kornfeld v. Commissioner, 137 F.3d 1231, 1235 (10th Cir. 1998), affg. T.C. Memo. 1996-472, and Gordon v. Commissioner, 85 T.C. 309, 324 (1985), respectively, apply this test to step together the series of related transactions at issue in those cases.

Here, the evidence of record and the parties' stipulation of the following facts show a plan for the joint purchase by related parties of partnership interests for the sole purpose of obtaining favorable tax benefits.[16] While the legal right of a taxpayer to decrease the amount of what otherwise would be his taxes or altogether avoid them by means which the law permits cannot be doubted, Gregory v. Helvering, 293 U.S. 465, 469 (1935), the Commissioner may disregard transactions which are designed to manipulate the tax laws so as to create artificial tax deductions, Northern Ind. Pub. Serv. Co. v. Commissioner, 115 F.3d 506, 512 (7th Cir. 1997) (citing Knetsch v. United States, 364 U.S. 361 (1960), as authority for that proposition), affg. 105 T.C. 341 (1995).

In 1986, Robert A. Page produced an 11-page letter, calling it his "epistle", in which he described what he believed to be a favorable device for extracting corporate assets without a

---

[16]Joint asset acquisitions give rise to tax planning techniques because value shifts from the present interest holder to the future interest holder without the latter's being taxed when the remainder interest vests in possession.

For purposes of this opinion, we take at face value the parties' stipulated submission of Joint Exhibit No. 181-FY, in which Mr. Page asserts that participating in the joint asset acquisitions creates tax benefits for the remaindermen by "extract[ing] cash from * * * [CGF and Lincoln] at an approximate 14% tax rate." Respondent asserts that this multitiered transaction was designed to create tax benefits for the term interest holders, too. More specifically, respondent emphasizes that, by participating in the joint asset acquisitions, petitioners sought to match amortization deductions against their income on U.S. Government securities, which they now owned indirectly through limited partnerships.

dividend or capital gains tax. One year later in 1987, Mr. Page led an in-depth discussion regarding Lincoln's current and future operations at Lincoln's annual board meeting.

In February 1988, during Lincoln's board meeting, Mr. Page moved that Lincoln buy 10-year term interests for up to $6 million. He also moved to have Lincoln redeem $5,440,000 worth of its preferred stock no later than March 31, 1988. An addendum to Mr. Page's first letter followed in March 1988. Then on March 28, 1988, Lincoln redeemed its preferred stock, and 3 days later, on March 31, 1988, Lincoln and the Lincoln Family Trusts formed four of the nine Lincoln Partnerships.

In April 1988, Mr. Page prepared yet another letter fleshing out the transactional details of his plan. Approximately 3 months later in July 1988, CGF made distributions to its shareholders and formed five limited partnerships with the CGF Family Trusts. Then in early October 1988, at one of Lincoln's board meetings, Mr. Page moved that Lincoln purchase term interests in up to five additional partnerships. He also moved to have Lincoln declare another dividend. The dividend distribution took place on October 31 and approximately 1 month later on December 9, 1988, Lincoln and the Lincoln Family Trusts created five more partnerships.

This chronology of events shows a definite pattern. Each time petitioners formed partnerships and acquired term interests therein, distributions were paid so that their shareholders could, likewise, invest in such partnerships and acquire the

remainder interests. This, of course, was no mere coincidence. Rather, it was one of a series of steps, the cumulative effect being to generate amortization deductions.

Generally, this series of events occurred as follows.[17] First, members of petitioners' boards of directors authorized the purchase of term interests in partnerships. Second, petitioners declared cash dividend distributions and/or stock redemptions while, at the same time, liquidating a substantial portion of their assets in U.S. Government securities, either directly or through capital withdrawals in partnerships so investing. Then petitioners formed limited partnerships by taking back term interests therein, while the Family Trusts simultaneously took back the remainders. Lastly, while petitioners began offsetting their distributive shares of partnership income with amortization and other deductions attributable to their term interests, the Family Trusts waited in the wings for their remainder interests to vest in possession without the incidence of taxation.

It is apparent that the transfers of funds to the Family Trusts and their purchases shortly thereafter of remainder interests in the limited partnerships constituted integrated transactions intended to move assets from petitioners to the Family Trusts with favorable tax consequences. Petitioners' distributions to the Family Trusts, followed by the formation of the CGF and Lincoln Partnerships, were not unconnected

[17]We note that the exact order may vary somewhat depending upon whether reference is made to CGF or Lincoln.

transactions.  Rather, they represented very important steps in the series.  Absent the initial step of distributing funds to the Family Trusts, the remaining steps of forming the CGF and Lincoln Partnerships, and of petitioners' acquiring the term interests and the Family Trusts' acquiring the remainders, could not have been successfully accomplished.  Indeed, the creation of these partnerships was necessary to achieve petitioners' intended end result, which was to funnel large amounts of money outside of petitioners' corporate structure and into the hands of their shareholders while enjoying favorable tax treatment.  The intention to bring about this end result is manifested in Robert A. Page's letters and in the minutes of petitioners' board meetings.  On the basis of the stipulated factual record, we conclude that, in spite of the form in which the joint investment transaction was cast, its substance shows petitioners acquiring partnership interests B in their entirety and then carving out remainder interests for the benefit of the Family Trusts.

It bears noting that, in his letter of May 15, 1986, Mr. Page wrote of a potential pitfall which could thwart the success of his plan; i.e., where the term interest holder funds the remaindermen with the amounts necessary to obtain their interests.  In that situation, he warned, petitioners would be viewed as acquiring the entire interest and then transferring the remainders to their shareholders, in which case the otherwise favorable tax results stemming from the amortization deductions would disappear.  Mr. Page's solution to this "limiting factor,"

as he called it, was to have the corporation distribute dividends
so that its shareholders would be regarded as independently
investing the after-tax proceeds in the CGF and Lincoln Partner-
ships.

The court in <u>Kornfeld v. Commissioner</u>, 137 F.3d 1231 (10th
Cir. 1998), addressed this very point.  In that case, where the
remaindermen had no legal obligation to use the funds provided by
the taxpayer to acquire their interests,[18] the court did not
regard <u>Gordon v. Commissioner</u>, 85 T.C. 309 (1985), as distin-
guishable.  The court noted that Mr. Kornfeld's intention in
making the gifts was to enable the donees to purchase the
remainder interests.  And as the Court of Appeals for the Tenth
Circuit pointed out:  "there is no reason these remaindermen
would question making the investments when taxpayer was giving
them the funds to make their purchases."  <u>Kornfeld v. Commis-
sioner</u>, <u>supra</u> at 1236.  Similarly, in <u>Gordon v. Commissioner</u>,
<u>supra</u>, the Court emphasized the parties' actual intent when it
addressed this argument in a footnote:

> We reject petitioners' argument that the fact that
> the trust was free to refuse to participate in any or
> all of the joint purchase transactions indicates that
> the trust's role as purchaser had substance.  For
> purposes of this question, the power to refuse is a
> fact to consider * * * but is of minimal significance

---

[18]In <u>Kornfeld v. Commissioner</u>, 137 F.3d 1231 (10th Cir.
1998), gift tax returns were filed in respect of all the funds
provided by Mr. Kornfeld to his daughters and secretary, whereas
in <u>Gordon v. Commissioner</u>, 85 T.C. 309 (1985), most of the
transfers of funds by Dr. Gordon to the family trust (holder of
the remainder interests) were not reflected in any gift tax
returns.

where, as here, the facts reveal that the entire transaction was set up around the expectation that the joint implementation of Gordon's investment strategy would occur. * * * [Id. at 331 n.16.]

Petitioners also attempt to focus our attention on the fact that only a part of their distributions was used by the Family Trusts to invest in the limited partnerships. Advancing what is essentially the same argument as above, petitioners contend that each trust exercised its separate discretion in deciding whether, and to what extent, it would participate in Mr. Page's joint investment scheme. Thus, they would have us treat their distributions separately from the actual joint purchases and would have us regard the remainder acquisitions as the result of the Family Trusts' independent investment decisions. While we recognize that petitioners' distribution amounts did not accord absolutely with the amounts subsequently invested by the Family Trusts in the limited partnerships, there was substantial overlapping. In the case of CGF, $7,977,586 was transferred to the CGF Family Trusts within 2 months of the trusts' investing $5,928,810 in the CGF Partnerships. In the case of Lincoln, $5,440,000 in stock redemptions was distributed to the Lincoln Family Trusts in March 1988, the same month in which those trusts subsequently invested $3,287,774 in the first four Lincoln Partnerships created. In October 1988, Lincoln distributed $3,998,678 in dividends to those Family Trusts, which subsequently invested $3,449,342 in the last five Lincoln Partnerships formed in early December.

The close identity of funds moving from petitioners to the Family Trusts and in turn to the CGF and Lincoln Partnerships,[19] coupled with the close proximity in time in which this occurred, suggests that the distribution amounts were intended all along to be used in the joint investment transactions. We are hard pressed to believe that the Family Trusts would have agreed to engage in such transactions without having first received petitioners' distributions shortly before acquiring their remainder interests.

Likewise, in Gordon v. Commissioner, supra, there was not complete identity in the amounts transferred to the trust and the amount subsequently invested by the trust in the remainder interest. For example, in one of the tax years at issue, Dr. Gordon deposited at least $78,141 in the trust's savings account, and the trust subsequently withdrew $47,592 to purchase a remainder interest in tax-exempt bonds, while in the next year, Dr. Gordon deposited at least $58,100 in its savings account, and the trust withdrew $97,853 to buy its remainder interest. We were satisfied, however, that "the trust appears to have been funded for little purpose other than to participate with Dr. Gordon in the implementation of his bond acquisition strategy, a fact that further indicates that Dr. Gordon should be treated as the true purchaser of the whole bonds." Id. at 329.

---

[19]If the after-tax proceeds of the distributions are compared with the amounts used to purchase the remainder interests, the numbers should align even more closely.

Petitioners argue that <u>Richard Hansen Land, Inc. v. Commissioner</u>, T.C. Memo. 1993-248, supports their amortization of the term interests. That case, however, is distinguishable. As stated earlier, a few very pertinent facts set apart <u>Richard Hansen Land, Inc. v. Commissioner</u>, <u>supra</u>, from the cases at bar. First, the corporation's payment of wages to Mr. Hansen was a separate and distinct transaction, one whose bona fides were never questioned by the Commissioner. <u>Id.</u> The payment of wages represented an ordinary and recurring part of the farming corporation's business. By way of contrast, CGF and Lincoln undertook redemptions and declared dividends as part of a plan to provide funds for the purchase of the remainder interests. Indeed, as Mr. Page described the plan: "The major portion of the funds for the purchase of the remainder interest * * * is provided from the after-tax proceeds of a[n] * * * extraordinary dividend". Generally speaking, a dividend is defined as extraordinary when it is unusual in amount and paid at an irregular time because of a particular corporate event. Black's Law Dictionary 587 (6th ed. 1990). Petitioners' distributions, occurring within months of the limited partnerships' being formed, were far from being recurring events in the cycle of corporate operations; rather, they were extraordinary, nonrecurring distributions that were made for a specific purpose as part of a prearranged plan.

The nature of the underlying transaction also serves to distinguish <u>Richard Hansen Land, Inc. v. Commissioner</u>, <u>supra</u>,

from the present cases. The taxpayer and Mr. Hansen jointly purchased a parcel of land which the corporation planted, harvested, and attended to in a manner typical of other farm corporations in the area. In the instant cases, petitioners and the Family Trusts jointly formed limited partnerships with petitioners owning, albeit indirectly, virtually the same assets that petitioners had previously owned outright; i.e., Federal Government bonds. More specifically, petitioners liquidated their interests in U.S. Government securities, held directly or through Net Venture, in order to fund the distributions made to their shareholders. Subsequently, petitioners acquired term interests in the limited partnerships which, in turn, reinvested petitioners' funds in entities such as Net Venture and Gopher Fund——investment partnerships owning U.S. Government obligations.

Unlike in Kornfeld v. Commissioner, 137 F.3d 1231 (10th Cir. 1998), Gordon v. Commissioner, 85 T.C. 309 (1985), and Richard Hansen Land, Inc. v. Commissioner, supra, where consideration moved to a third party, in the instant cases, funds remained within the same family group. For example, in the case of Lincoln, the amounts contributed by Lincoln and the Lincoln Family Trusts to the Lincoln Partnerships, if viewed as an aggregate of all the members, can aptly be described as transfers of money from that family's front pocket to its back pocket. This makes the case against petitioners even stronger; here, related parties obtained tax benefits without making any outlays of money to third parties. A mere shuffling around of income

within the same family group would, petitioners had hoped, bring about the favorable tax consequences which they had planned for 2 years earlier.

Unquestionably, what we have here is a tax scheme in the form of joint partnership investments. Without disturbing the character of their investment portfolio to any great extent, petitioners acquired term interests in limited partnerships as vehicles for creating tax deductions and for transferring income to the Family Trusts at favorable tax rates. Petitioners' amortization deductions of their term interests in the CGF and Lincoln Partnerships were simply the last step in a series of prearranged transactions designed from the outset to achieve their intended result. In these circumstances, where the evidence overwhelmingly supports this finding, we add that the fact that the Family Trusts paid taxes on the distributions they received from petitioners is not, in and of itself, sufficient to distinguish the present cases from Gordon v. Commissioner, supra, and Kornfeld v. Commissioner, supra.[20] The Court recognizes that, in Richard Hansen Land, Inc. v. Commissioner, supra, Mr. Hansen received wheat from his corporation and reported its value as wages on his Federal income tax return. However, as

---

[20]In Gordon v. Commissioner, 85 T.C. 309 (1985), no payment of taxes was made because Dr. Gordon failed consistently to treat as gifts the bulk of his cash transfers to the family trust. In Kornfeld v. Commissioner, 137 F.3d 1231 (10th Cir. 1998), while Mr. Kornfeld did file gift tax returns reflecting the gifts to the remaindermen, he paid no tax on account of the unified credit. Sec. 2505.

shown above, the wages were earned by and paid to him in the
ordinary course of the corporation's business.  The factual
circumstances in Richard Hansen Land, Inc. v. Commissioner,
supra, are distinguishable from the cases at bar.  Here, the
amounts distributed to the Family Trusts were calculated to take
into account the after-tax proceeds that would remain available
for their use in the joint asset purchases.  Robert A. Page, as
engineer of the plan, left little to chance.  What we have before
us is a purely tax-motivated scheme in the form of joint asset
acquisitions for the purpose of transferring assets from peti-
tioners to the Family Trusts with minimal tax liability.  As the
court in Saviano v. Commissioner, 765 F.2d 643, 654 (7th Cir.
1985), affg. 80 T.C. 955 (1983), recognized:

> The freedom to arrange one's affairs to minimize taxes
> does not include the right to engage in financial
> fantasies with the expectation that the Internal
> Revenue Service and the courts will play along.  The
> Commissioner and the courts are empowered, and in fact
> duty-bound, to look beyond the contrived forms of
> transactions to their economic substance and to apply
> the tax laws accordingly.  That is what we have done in
> this case and that is what taxpayers should expect in
> the future.

We are satisfied that, on the basis of the record as a
whole, petitioners acquired entire interests in the CGF and
Lincoln Partnerships and then transferred the remainder interests
therein to the Family Trusts.  Accordingly, using Kornfeld v.
Commissioner, supra, Lomas Santa Fe, Inc. v. Commissioner, 693
F.2d 71 (9th Cir. 1982), United States v. Georgia R.R. & Banking
Co., 348 F.2d 278 (5th Cir. 1965), and Gordon v. Commissioner,

supra, we sustain respondent's disallowance of petitioners' amortization deductions as determined in the notices of deficiency.[21]

To reflect the foregoing and concessions by respondent,

Decisions will be entered

under Rule 155.

---

[21]Given our holding herein, we offer no opinion on whether, as respondent contends, amortizing term interests in partnerships is inconsistent with the principles of subch. K. We also need not decide whether petitioners' argument based on the clear reflection of income principle, raised for the first time in their opening brief, was made too late to be considered. See Aero Rental v. Commissioner, 64 T.C. 331, 338 (1975); Greenberg v. Commissioner, 25 T.C. 534, 537 (1955).

## APPENDIX A

### CGF One, L.P.

| Type of Interest | Contribution |
|---|---|
| **Partnership Interest A** | |
| Ruth G. Fink Trust Number One | $3,277 |
| **Partnership Interest B--Term** | |
| CGF Industries, Inc. | 2,011,312 |
| **Partnership Interest B--Remainder** | |
| H. Bernerd Fink Revocable Trust | 12,620 |
| Ruth G. Fink Trust Number One | 328,121 |
| Ruth G. Fink Trust Number Three | 12,620 |
| Ruth G. Fink Trust Number Four | 12,620 |
| Ruth G. Fink Trust Number Five | 12,620 |
| Ruth G. Fink Partnership | 403,841 |
| Ruth G. Fink Partnership Number Two | 201,921 |
| Ruth G. Fink Charitable Trust Number One | 277,641 |

### CGF Two, L.P.

| | |
|---|---|
| **Partnership Interest A** | |
| Marcia F. Anderson Trust Number One | 2,962 |
| **Partnership Interest B--Term** | |
| CGF Industries, Inc. | 1,817,938 |
| **Partnership Interest B--Remainder** | |
| Marcia F. Anderson Revocable Trust | 330,794 |
| Robert J. Anderson Revocable Trust | 34,220 |
| Jane E. Anderson Revocable Trust | 193,914 |
| Nancy J. Anderson Revocable Trust | 193,914 |
| Robert J. Anderson, Custodian | 193,914 |
| Marcia F. Anderson Trust Number One | 193,914 |

### Santa Fe Partners, L.P.

| | |
|---|---|
| **Partnership Interest A** | |
| Caroline A. Cochener Trust Number Five | 3,690 |
| **Partnership Interest B--Term** | |
| CGF Industries, Inc. | 2,265,250 |
| **Partnership Interest B--Remainder** | |
| Caroline A. Cochener Trust | 568,535 |
| Caroline A. Cochener Trust Number Two | 284,268 |
| Caroline A. Cochener Revocable Trust | 284,268 |
| Bruce M. Bolene Revocable Trust | 284,268 |

## Cloud Grey, L.P.

| Type of Interest | Contribution |
|---|---|
| **Partnership Interest A** | |
| Diana C. Broze Trust Number Five | $3,690 |
| | |
| **Partnership Interest B--Term** | |
| CGF Industries, Inc. | 2,265,250 |
| | |
| **Partnership Interest B--Remainder** | |
| Diana C. Broze Revocable Trust | 426,401 |
| Vincent J. Broze Revocable Trust | 28,427 |
| Joaquin Mason Trust Number One | 127,920 |
| Joaquin Mason Trust Number Two | 56,854 |
| Vincent J. Broze, Custodian | 127,920 |
| Diana C. Broze Trust Number Three | 28,427 |
| Diana C. Broze Trust Number Four | 28,427 |
| Diana C. Broze Trust Number Five | 28,427 |
| Diana C. Broze Trust Number Six | 568,535 |

## Alpha One, L.P.

| Type of Interest | Contribution |
|---|---|
| **Partnership Interest A** | |
| Alpha, L.P., a Kansas Ltd. Partnership} | |
| Bruce G. Cochener Trust Number Three  } | 3,690 |
| | |
| **Partnership Interest B--Term** | |
| CGF Industries, Inc. | 2,265,250 |
| | |
| **Partnership Interest B--Remainder** | |
| Alpha, L.P. | 1,421,338 |

APPENDIX B

<u>Lincoln Partnership #1, L.P.</u>

| <u>Type of Interest</u> | <u>Contribution</u> |
|---|---|
| <u>Partnership Interest A</u> | |
| Georgia L. Johnson Revocable Trust | $2,444 |
| | |
| <u>Partnership Interest B--Term</u> | |
| Lincoln Industries, Inc. | 1,500,000 |
| | |
| <u>Partnership Interest B--Remainder</u> | |
| Georgia L. Johnson Trust Number Four | 2,441 |
| Georgia L. Johnson Revocable Trust | 938,739 |

<u>Lincoln Partnership #2, L.P.</u>

| | |
|---|---|
| <u>Partnership Interest A</u> | |
| Lincoln Family Trust Number Two | 2,444 |
| | |
| <u>Partnership Interest B--Term</u> | |
| Lincoln Industries, Inc. | 1,500,000 |
| | |
| <u>Partnership Interest B--Remainder</u> | |
| Edward M. Lincoln Revocable Trust | 117,647 |
| Edward M. Lincoln Trust Number Two | 235,295 |
| Edward M. Lincoln Trust Number Three | 235,295 |
| Edward M. Lincoln Trust Number Seven | 117,647 |
| Lincoln Family Trust Number Two | 235,295 |

<u>Lincoln Partnership #3, L.P.</u>

| | |
|---|---|
| <u>Partnership Interest A</u> | |
| Margaret L. Donlan Trust Number Four | 2,444 |
| | |
| <u>Partnership Interest B--Term</u> | |
| Lincoln Industries, Inc. | 1,500,000 |
| | |
| <u>Partnership Interest B--Remainder</u> | |
| Margaret L. Donlan Revocable Trust | 739,782 |
| Margaret L. Donlan Trust Number Five | 201,397 |

## HFC Partnership, L.P.

| Type of Interest | Contribution |
|---|---|
| **Partnership Interest A** | |
| Lincoln Family Trust Number Four | $24,657 |
| **Partnership Interest B--Term** | |
| Lincoln Industries, Inc. | 1,500,000 |
| **Partnership Interest B--Remainder** | |
| Ann L. Hunter Trust Number Two | 37,640 |
| Lincoln Family Trust Number Four | 903,369 |

## Lincoln 88 Partnership, L.P.

| | |
|---|---|
| **Partnership Interest A** | |
| Olivia G. Lincoln Revocable Trust | 39,865 |
| **Partnership Interest B--Term** | |
| Lincoln Industries, Inc. | 3,360,000 |
| **Partnership Interest B--Remainder** | |
| Olivia G. Lincoln Revocable Trust | 170,127 |
| Olivia G. Lincoln Trust Number One | 82,130 |
| Olivia G. Lincoln Trust Number Two | 82,130 |
| Olivia G. Lincoln Trust Number Three | 82,130 |
| Olivia G. Lincoln Trust Number Four | 82,130 |
| George A. Lincoln Trust Number One | 29,332 |
| George A. Lincoln Trust Number Two | 29,332 |
| George A. Lincoln Trust Number Three | 29,332 |

## Lincoln Partnership #11, L.P.

| | |
|---|---|
| **Partnership Interest A** | |
| Georgia L. Johnson Trust Number Four | 52,323 |
| **Partnership Interest B--Term** | |
| Lincoln Industries, Inc. | 4,410,000 |
| **Partnership Interest B--Remainder** | |
| Georgia L. Johnson Revocable Trust | 269,490 |
| Georgia L. Johnson Trust Number Two | 223,292 |
| Lincoln Partnership #1, L.P. | 277,190 |

## Two Thousand Eight Partnership, L.P.

| Type of Interest | Contribution |
|---|---|
| **Partnership Interest A** | |
| Lincoln Family Trust Number Two | $52,323 |
| | |
| **Partnership Interest B--Term** | |
| Lincoln Industries, Inc. | 4,410,000 |
| | |
| **Partnership Interest B--Remainder** | |
| Edward M. Lincoln Revocable Trust | 123,196 |
| Edward M. Lincoln Trust Number Two | 19,249 |
| Edward M. Lincoln Trust Number Three | 160,154 |
| Edward M. Lincoln Trust Number Four | 46,198 |
| Edward M. Lincoln Trust Number Five | 115,496 |
| Edward M. Lincoln Trust Number Six | 200,193 |
| Lincoln Family Trust Number Two | 105,486 |

## Donlan Partnership #1, L.P.

| | |
|---|---|
| **Partnership Interest A** | |
| Margaret L. Donlan Trust Number Four | 52,323 |
| | |
| **Partnership Interest B--Term** | |
| Lincoln Industries, Inc. | 4,410,000 |
| | |
| **Partnership Interest B--Remainder** | |
| Margaret L. Donlan Revocable Trust | 415,785 |
| Margaret L. Donlan Trust Number Two | 121,271 |
| Margaret L. Donlan Trust Number Three | 115,496 |
| Margaret L. Donlan Trust Number Five | 117,421 |

## HFC2 Partnership, L.P.

| | |
|---|---|
| **Partnership Interest A** | |
| Lincoln Family Trust Number Four | 52,323 |
| | |
| **Partnership Interest B--Term** | |
| Lincoln Industries, Inc. | 4,410,000 |
| | |
| **Partnership Interest B--Remainder** | |
| Ann L. Hunter Revocable Trust | 269,490 |
| Ann L. Hunter Trust Number Three | 307,989 |
| Ann L. Hunter Trust Number Four | 153,994 |
| Ann L. Hunter Trust Number Twenty-six | 38,499 |

APPENDIX C

Mar. 31, 1989

| | Net Venture | Gopher Fund | Lake Union | GAR Ninety |
|---|---|---|---|---|
| CGF One, L.P. | $2,070,705 (61.59%) | $1,130,652 (33.63%) | -0- | $160,533 (4.78%) |
| CGF Two, L.P. | 2,022,499 (66.30%) | 1,027,866 (33.7%) | -0- | -0- |
| Santa Fe Partners, L.P. | 2,988,503 (78.91%) | 611,580 (16.15%) | -0- | 185,633 (4.90%) |
| Cloud Grey, L.P. | 2,521,763 (66.52%) | 1,269,414 (33.48%) | -0- | -0- |
| Alpha One, L.P. | 2,773,864 (73.09%) | 1,021,352 (26.91%) | -0- | -0- |

Mar. 31, 1990

| | Net Venture | Gopher Fund | Lake Union | GAR Ninety |
|---|---|---|---|---|
| CGF One, L.P. | 2,017,861 (55.98%) | 1,226,376 (34.02%) | 200,000 (5.55%) | 160,401 (4.45%) |
| CGF Two, L.P. | 2,000,075 (61.15%) | 1,070,434 (32.73%) | 200,000 (6.12%) | -0- |
| Santa Fe Partners, L.P. | 2,771,255 (68.99%) | 1,000,664 (24.91%) | -0- | 185,478 (4.62%) |
| Cloud Grey, L.P. | 2,484,951 (60.90%) | 1,295,159 (31.74%) | 300,000 (7.35%) | -0- |
| Alpha One, L.P. | 1,966,100 (49.54%) | 497,001 (12.52%) | 600,000 (15.12%) | 605,404 (15.25%) |

Mar. 31, 1991

| | Net Venture | Gopher Fund | Lake Union | GAR Ninety |
|---|---|---|---|---|
| CGF One, L.P. | 1,947,650 (54.75%) | 1,247,076 (35.05%) | 200,662 (5.64%) | 162,150 (4.56%) |
| CGF Two, L.P. | 1,942,005 (59.83%) | 1,103,451 (33.99%) | 200,663 (6.18%) | -0- |
| Santa Fe Partners, L.P. | 2,405,738 (60.33%) | 1,048,279 (26.29%) | -0- | 187,545 (4.70%) |
| Cloud Grey, L.P. | 2,405,300 (59.83%) | 1,313,817 (32.68%) | 300,993 (7.49%) | -0- |
| Alpha One, L.P. | 1,144,804 (31.44%) | 131,784 (3.62%) | 601,986 (16.53%) | 612,529 (16.82%) |

Mar. 31, 1992

| | Net Venture | Gopher Fund | Lake Union | GAR Ninety |
|---|---|---|---|---|
| CGF One, L.P. | 1,888,475 (53.54%) | 1,294,523 (36.70%) | 185,433 (5.26%) | 158,983 (4.51%) |
| CGF Two, L.P. | 1,894,917 (58.87%) | 1,138,216 (35.36%) | 185,435 (5.76%) | -0- |
| Santa Fe Partners, L.P. | 1,727,296 (43.65%) | 1,690,132 (42.71%) | -0- | 183,803 (4.65%) |
| Cloud Grey, L.P. | 2,344,095 (58.96%) | 1,353,309 (34.04%) | 278,151 (7.00%) | -0- |
| Alpha One, L.P. | 605,378 (18.65%) | 6,400 (.20%) | 556,301 (17.14%) | 339,630 (10.46%) |

APPENDIX D

Mar. 31, 1989

| | Net Venture | Gopher Fund | Gill Industries, L.P. | Falcon Fund |
|---|---|---|---|---|
| Lincoln Partnership #1, L.P. | $2,295,308 (89%) | -0- | -0- | -0- |
| Lincoln Partnership #2, L.P. | 2,573,908 (100%) | -0- | -0- | -0- |
| Lincoln Partnership #3, L.P. | 2,574,495 (100%) | -0- | -0- | -0- |
| HFC Partnership, L.P. | 2,572,154 (100%) | -0- | -0- | -0- |
| Lincoln 88 Partnership, L.P. | 4,005,510 (100%) | -0- | -0- | -0- |
| Lincoln Partnership #11, L.P. | 5,278,795 (100%) | -0- | -0- | -0- |
| Two Thousand Eight Partnership, L.P. | 5,239,295 (100%) | -0- | -0- | -0- |
| Donlan Partnership #1, L.P. | 5,239,295 (100%) | -0- | -0- | -0- |
| HFC2 Partnership, L.P. | 5,189,295 (100%) | -0- | -0- | -0- |

Mar. 31, 1990

| | Net Venture | Gopher Fund | Gill Industries, L.P. | Falcon Fund |
|---|---|---|---|---|
| Lincoln Partnership #1, L.P. | 2,344,260 (89%) | -0- | -0- | -0- |
| Lincoln Partnership #2, L.P. | 2,608,416 (100%) | -0- | -0- | -0- |
| Lincoln Partnership #3, L.P. | 2,519,273 (97%) | -0- | -0- | -0- |
| HFC Partnership, L.P. | 1,315,254 (52%) | $300,830 (12%) | $768,644 (31%) | -0- |
| Lincoln 88 Partnership, L.P. | 4,306,465 (100%) | -0- | -0- | -0- |
| Lincoln Partnership #11, L.P. | 5,662,646 (100%) | -0- | -0- | -0- |
| Two Thousand Eight Partnership, L.P. | 5,661,210 (100%) | -0- | -0- | -0- |
| Donlan Partnership #1, L.P. | 5,640,410 (100%) | -0- | -0- | -0- |
| HFC2 Partnership, L.P. | 2,843,922 (54%) | 601,660 (11%) | 1,537,288 (29%) | -0- |

Mar. 31, 1991

| | Net Venture | Gopher Fund | Gill Industries, L.P. | Falcon Fund |
|---|---|---|---|---|
| Lincoln Partnership #1, L.P. | $2,335,433 (89%) | -0- | -0- | -0- |
| Lincoln Partnership #2, L.P. | 160,650 (6%) | -0- | -0- | $2,251,000 (86%) |
| Lincoln Partnership #3, L.P. | 2,500,084 (100%) | -0- | -0- | -0- |
| HFC Partnership, L.P. | 1,073,125 (44%) | $547,863 (22%) | $695,483 (28%) | -0- |
| Lincoln 88 Partnership, L.P. | 3,932,136 (91%) | -0- | -0- | -0- |
| Lincoln Partnership #11, L.P. | 5,663,261 (100%) | -0- | -0- | -0- |
| Two Thousand Eight Partnership, L.P. | 145,496 (3%) | -0- | -0- | 5,465,000 (97%) |
| Donlan Partnership #1, L.P. | 5,304,234 (95%) | -0- | -0- | -0- |
| HFC2 Partnership, L.P. | 2,204,380 (42%) | 1,095,727 (21%) | 1,390,967 (26%) | -0- |

Mar. 31, 1992

| | Net Venture | Gopher Fund | Gill Industries, L.P. | Falcon Fund |
|---|---|---|---|---|
| Lincoln Partnership #1, L.P. | 1,301,765 (51%) | 693,050 (27%) | -0- | 301,518 (12%) |
| Lincoln Partnership #2, L.P. | 1,640,030 (63%) | -0- | -0- | 762,301 (29%) |
| Lincoln Partnership #3, L.P. | 1,305,818 (52%) | 1,191,836 (48%) | -0- | -0- |
| HFC Partnership, L.P. | 1,034,352 (42%) | 566,257 (23%) | 665,673 (27%) | -0- |
| Lincoln 88 Partnership, L.P. | 3,837,320 (89%) | -0- | -0- | -0- |
| Lincoln Partnership #11, L.P. | 5,615,134 (100%) | -0- | -0- | -0- |
| Two Thousand Eight Partnership, L.P. | 1,859,255 (33%) | -0- | -0- | 3,766,238 (67%) |
| Donlan Partnership #1, L.P. | 2,617,115 (47%) | 2,572,652 (46%) | -0- | -0- |
| HFC2 Partnership, L.P. | 1,659,426 (32%) | 1,133,910 (22%) | 1,331,345 (25%) | -0- |

Mar, 31, 1993

| | Net Venture | Gopher Fund | Gill Industries, L.P. | Falcon Fund |
|---|---|---|---|---|
| Lincoln Partnership #1, L.P. | $918,338 (36%) | $689,373 (27%) | -0- | $646,302 (26%) |
| Lincoln Partnership #2, L.P. | 1,582,013 (61%) | -0- | -0- | 798,356 (31%) |
| Lincoln Partnership #3, L.P. | 1,227,878 (50%) | 1,218,243 (50%) | -0- | -0- |
| HFC Partnership, L.P. | 1,071,313 (42%) | 586,284 (23%) | $711,263 (28%) | -0- |
| Lincoln 88 Partnership, L.P. | 3,398,414 (88%) | -0- | -0- | -0- |
| Lincoln Partnership #11, L.P. | 5,608,393 (100%) | -0- | -0- | -0- |
| Two Thousand Eight Partnership, L.P. | 3,629,269 (65%) | -0- | -0- | 1,940,994 (35%) |
| Donlan Partnership #1, L.P. | 2,457,021 (45%) | 2,619,070 (48%) | -0- | -0- |
| HFC2 Partnership, L.P. | 1,694,779 (32%) | 1,163,864 (22%) | 1,422,525 (27%) | -0- |